## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAYMOND GRESHAM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0752 (JR)** |
| **DIRK KEMPTHORNE, Secretary,** | ) |
| **U.S. Department of Interior,** | ) |
| **NATIONAL PARK SERVICE,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants, by and through their attorney, the United States Attorney for the District of

Columbia, respectfully move this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6), for an order dismissing plaintiff's action for lack of subject matter jurisdiction and

failure to state a claim upon which relief can be granted.  In the alternative, Defendants move the

Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting Defendants summary

judgment on the grounds that no genuine issue of material fact exists, and Defendants are entitled

to judgment as a matter of law.

In support of this Motion, Defendants respectfully submit the attached Memorandum of

Points and Authorities with Exhibits attached thereto, a Statement of Material Facts Not in

Genuine Dispute, and a proposed Order.[1]

---

[1]Plaintiff will take notice that any factual assertions contained in the documents in support of
Defendants' Motion may be accepted by the Court as true unless plaintiff controverts them with
his own affidavit or other documentary evidence.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir.
1992), and LCvR 7, 56.1.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


/s/
MARIAN L. BORUM
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
202-514-6531
Attorneys for Defendants

---

As stated in Fed. R. Civ. P. 56(e):
> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, may be entered against the
> adverse party.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAYMOND GRESHAM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0752 (JR)** |
| **DIRK KEMPTHORNE, Secretary,** | ) |
| **U.S. Department of Interior,** | ) |
| **NATIONAL PARK SERVICE,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h), Defendants hereby provide the following Statement of

Material Facts as to Which There is No Genuine Dispute:

1) Plaintiff brought the claims in his Complaint pursuant to 42 U.S.C. § 1983.  See

Complaint at 2.

2) Plaintiff is a Maintenance Worker Supervisor with the Memorial Crew, Division of

Resource Management, National Mall and Memorial Parks, National Park Service, United States

Department of Interior.  See Exhibit 1, Report of Investigation ("ROI") at 1.

3) Prior to August 21, 2005, Plaintiff was instructed to have his crew wash the interior

and exterior walls of the Lincoln Memorial.  See Exhibit 2 ( Electronic Mail from Jesse Mallard

to Plaintiff).

4) By October 28, 2005, the job was not completed.  See Exhibit 3 (Electronic Mail from

Jesse Mallard to Plaintiff, dated November 2, 2005).

5) On November 7, 2005, Plaintiff complained to management "that the high lift provided

by the agency was defective; and he could not perform his assigned duties with the faulty

equipment."  Complaint at 3.

6) On November 7, 2005, management went to the site, examined the high lift, determined that it was defective, and took it out of service.  <u>See</u> Exhibit 10 (ROI, Deposition Transcript of Anthony Ashdown ("Ashdown Dep.") at 23-24; Exhibit 12 (ROI, Deposition Transcript of Rose Capers-Webb ("Capers-Webb Dep.") at 9-10; Complaint at 3.

7) On November 23, 2005, Plaintiff informed management that workers on another crew were using "the government's computer to view porn sites on government time."  <u>See</u> Complaint at 3.

8) A Department of Interior Internet Technology/Computer Specialist examined the computer and determined it had not been used to view pornographic sites.  <u>See</u> Exhibit 4 (ROI, Deposition Transcript of Jesse Mallard ("Mallard Dep.") at 20-21.

9) On November 29, 2005, Anthony Ashdown, Safety Manager, National Mall and Memorial Parks, sent an electronic mail to numerous individuals, including Plaintiff, with a picture of man holding a dead snake with a particular tool.  <u>See</u> Exhibit 5 (Electronic Mail from Anthony Ashdown, dated November 29, 2005).

10) The Department of Interior Equal Employment Opportunity Office ("EEO") did not complete the investigation of Plaintiff's EEO complaint within 180 days pursuant to 29 C.F.R. § 1614.108(e).  <u>See</u> Exhibit 6 at 2-3 (Correspondence to E. Ned Sloan from EEO Program Manager, dated November 28, 2006); Complaint at 4.

11) Plaintiff requested that his EEO complaint be dismissed.  <u>See</u> Complaint at 4.

Respectfully submitted,


/s/

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


/s/

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


/s/

MARIAN L. BORUM, D.C. Bar #435409
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
202-514-6531
Attorneys for Defendants

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAYMOND GRESHAM,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )
                                          ) Civil Action No. 07-0752 (JR)
DIRK KEMPTHORNE, Secretary,               )
U.S. Department of Interior,              )
NATIONAL PARK SERVICE,                    )
                                          )
            Defendants.                   )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT

Defendants, Dirk Kempthorne, Secretary, United States Department of Interior, and the

National Park Service respectfully request that this Court, dismiss the Complaint in the

above-captioned matter.   In the alternative, Defendants move the Court for an order granting

Defendants summary judgment.

I.  FACTUAL BACKGROUND

Plaintiff, Raymond Gresham, is an African American male and a Maintenance Worker

Supervisor for the Division of Resource Management, National Mall and Memorial Parks, at the

National Park Service.  See Exhibit 1 at 1.  He supervises the Memorial Crew which cleans the

monuments and surrounding grounds.  See id. at 1, 4.  Prior to August 21, 2005, Plaintiff  was

instructed to have his crew wash the interior and exterior walls of the Lincoln Memorial.  See

Exhibit 2.  Plaintiff requested supplies in order to complete the job.  See Exhibit 7 (Supply List,

dated August 25, 2005).  After receiving the assignment, Plaintiff did not report to his immediate

supervisor, Jesse Mallard, that any equipment was defective.  See Exhibit 4 (Mallard Dep. at 9).

After repeated requests from management to complete the job, by October 28, 2005, the job was

not completed.  See Exhibit 3.  On November 7, 2005, Plaintiff complained to management "that

the high lift provided by the agency was defective."  Complaint at 3.  In response, that day,

management went to the site, examined the high lift, determined that it was defective, and took it

out of service.  See Exhibit 10, Ashdown Dep. at 23-24; Capers-Webb Dep. at 9-10; Complaint

at 3.

On November 23, 2005, Plaintiff informed management that workers on another crew

were using "the government's computer to view porn sites on government time."  See Complaint

at 3.  Plaintiff was informed that his allegations were serious and, if he had evidence or witnesses

of such, he should formally address the matter with his supervisor, so the allegation could be

investigated and action taken.  See Exhibit 9 (e-mail from Anthony Ashdown to Plaintiff dated

November 23, 2005).  Nevertheless, a Department of Interior Internet Technology/Computer

Specialist was contacted to examine the computer.  See Exhibit 4, Mallard Dep. at 20-23.  The

Specialist determined that the computer had not been used to view pornographic sites.  Id.

On November 29, 2005, Anthony Ashdown, Safety Manager, National Mall and

Memorial Parks, sent an electronic mail to numerous individuals, including Plaintiff, with a

picture of man holding a dead snake with a mechanical grabber.  See Exhibit 5.  The purpose of

the e-mail was to demonstrate the safety and ergonomic benefits of using this type tool rather

than a tool that was still being used by the Park Service.  See Exhibit 10, Ashdown Dep. at 43-

47.

The Department of Interior Equal Employment Opportunity Office ("EEO") did not

complete the investigation of Plaintiff's EEO complaint within 180 days pursuant to 29 C.F.R. §

1614.108(e), and Plaintiff requested that his EEO complaint be dismissed. <u>See</u> Complaint at 4;

Exhibit 4 at 2-3.

As a result, in this action, Plaintiff makes the following claims:

A) Anthony Ashdown, Safety Manager, violated his First Amendment rights to redress a grievance by harassing him and sending him a death threat in violation of his First Amendment rights, <u>see</u> Complaint at 5;

B) the Department of Interior's Equal Employment Opportunity Office did not investigate his complaint within the required 180 days, in violation of his Fifth Amendment rights, <u>see id</u>. at 5-6;

C) he was prevented from "exercis[ing] his liberty to enjoy the pursuit of his lively hood (sic) without undo (sic) harassment . . . from management when he report[ed] defective equipment[,]" <u>see id</u>. at 6;

D) his right to redress a grievance against two employees for using a government computer to visit pornographic sites without fear of reprisal and harassment from his white manager was violated, <u>see id</u>;

E) his Fifth Amendment right to have his formal complaint investigated within 180 days "without undo (sic) interference from Management" was violated, <u>see id</u>.;

F) his "First Amendment right to redress grievances to his Supervisor and Management without fear of harassment and retaliation" was violated, <u>id</u>.;

G) his right "to work in a safe environment with safe equipment without fear of being harassed and verbally abused" was violated, <u>id</u>.; and

H) his right to redress a grievance without his manager threatening his life was violated.

<u>Id</u>.

## II. STANDARDS OF REVIEW

1) <u>Motions to Dismiss</u>

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move to dismiss a

plaintiff's complaint where the court "lack[s] jurisdiction over the subject matter." The plaintiff

bears the burden of establishing that this Court has subject matter jurisdiction. See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).  When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the allegations of the complaint must be construed in favor of the pleader.  See Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987).  The Court need not accept factual inferences drawn by the plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions.  See Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court may consider matters beyond the pleadings.  See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Scolaro v. D.C. Bd. of Elections and Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), aff'd No. 00-7176, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001).

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test whether the plaintiff has properly stated a claim.  Pitney Bowes, Inc. v. U.S. Postal Service, 27 F.Supp.2d 15, 19 (D.D.C. 1998).  A complaint may be dismissed for failure to state a claim upon which relief can be granted if the facts pled and reasonable inferences therefrom are legally insufficient to support the relief requested.  Appleton v. United States, 69 F. Supp.2d 83, 86 (D.D.C. 1999).  As in a motion to dismiss for lack of subject matter jurisdiction, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Scheuer v. Rhodes, 416 U.S. 232 (1974).  However, the court is not required to accept inferences

4

unsupported by the facts alleged, nor need it accept legal conclusions that are cast as factual

allegations.  Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); U.S. v. BCCI

Holdings, 980 F. Supp. 21, 26 (D.D.C. 1997).  In this case, Plaintiff fails to establish a right to

relief on the claims asserted, even when accepting the facts he alleges as true.

    2) Motion for Summary Judgment

    Summary judgment is appropriate when the pleadings and evidence demonstrate that no

genuine issue of material fact exists such that the moving party is entitled to judgment as a matter

of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538,

1540 (D.C. Cir. 1995).  A genuine issue is one that could change the outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 243 (1986).  The evidence and the inferences

drawn therefrom must be considered in the light most favorable to the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party moving

for summary judgment need not prove the absence of an essential element of the nonmoving

party's case.  Celotex, 477 U.S. at 325.  Once the moving party has met its burden, the non-

movant may not rest on mere allegations, but must proffer specific facts showing that a genuine

issue exists for trial.  Matsushita Elec. Indus. Co., 475 U.S. at 586; Hayes v. Shalala, 902 F.Supp.

259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere

unsupported allegations or denials); Johnson v. Digital Equip. Corp., 836 F.Supp. 14, 18 (D.D.C.

1993) (evidence that is merely colorable or not sufficiently probative is insufficient to defeat

summary judgment); Baton v. Powell, 912 F.Supp. 565, 578 (D.D.C. 1996).  See Greene v.

Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting conclusory allegations as true . . . would

defeat the central purpose of the summary judgment device, which is to weed out those cases

insufficiently meritorious to warrant the expense of a jury trial.").

### III.  ARGUMENT

**A.  Plaintiff Has Failed to Establish That He Was Subjected to a Hostile Work Environment.**

In Claims A, C, D, F and G of Plaintiff's Complaint, he asserts that he was harassed.  See Complaint at 5-6.  Plaintiff brings these claims under 42 U.S.C. § 1983, rather than Title VII of the Civil Rights Act.  See id. at 2.  Therefore, these claims must be dismissed because Title VII is the exclusive mechanism under which employees alleging employment discrimination may base an action against the Federal Government.  Brown v. Gen. Serv. Admin., 425 U.S. 820, 828-29 (1976); Richardson v. Wiley, 569 F.2d 140, 141 (D.C. Cir. 1977) (*per curiam)*.

However, even if Plaintiff had brought these claims under Title VII, he would be unable to establish that he was subjected to harassment such that it created a hostile work environment. A workplace environment only becomes "hostile" for the purposes of Title VII when offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Barbour v. Browner, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999) (quoting Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 78 (1998)); see also Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001); Holbrook v. Reno, 196 F.3d 255, 262 (D.C. Cir 1999); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  "The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); see also id. (actionable conduct must be "extreme").

To determine whether a work environment is sufficiently hostile to be actionable under

Title VII, a court is to consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and, (4) whether the conduct reasonably interferes with the employee's performance.  Id. at 787-88. "Properly applied, this will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes and occasional teasing.'" Id. at 787; see also id. ("'mere utterance of ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII'") (quoting  Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).  Accordingly, isolated incidents of verbal abuse based on a protected class are simply insufficient to prove the level of severity of the conduct required.  See Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1260-61 (10th Cir. 1998); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1356 (10th Cir. 1997).

In examining each of Plaintiff's harassment claims, it is clear that Plaintiff was not subjected to a hostile work environment.  With respect to harassment allegation in Claim A, Plaintiff asserts that, on November 29, 2005, he received an electronic mail message from Mr. Ashdown with a message which stated, "this is what happens to snitches in the National Park Service."  Complaint at 4.  See Exhibit 1 and Complaint at 2.  Plaintiff claims that he felt the electronic mail was a death threat because it arrived soon after he reported that some employees were viewing pornographic material on a government computer.  See Exhibit 1 at 6.

The electronic mail to which Plaintiff refers pictured a man holding a large snake with a mechanical grabber.  See Exhibit 5.  The e-mail was sent to numerous individuals.  See Exhibit

7

11 (E-mail Distribution List of Anthony Ashdown).  In fact, according to the deposition of

Anthony Ashdown, he "sent it to many, many supervisors. [He] even sent it to folks who [he]

attended fundamentals class with.  In fact, someone sent it to [him]. . . [I]t even went to . . . [his]

counterparts in the other parks in the region."  Exhibit 10, Ashdown Dep. at 44-45.

　　　　According to the deposition of Jesse Mallard, Jr., Statue Preservation Supervisor,

"[Plaintiff], among 50 other people . . . got the same e-mail.  [Mr. Mallard] got a copy, like all of

the employees."  Exhibit 4, Mallard Dep. at 22.  In addition, according to the deposition of Rose

Capers-Webb, Regional Safety Manager, she also received the e-mail.  See Exhibit 12, Capers-

Webb Dep. at 19.

　　　　While Plaintiff contends that the e-mail constituted a threat upon his life, the subject line

of the e-mail read "Ergonomic Solution."  See Exhibit 5.  The content of the message directed

the recipients to look at the mechanical grabber the man used to hold the dead snake.  It stated

that the picker stickers, with the nails on the end of them, that may still be used by the Park

Service were potentially hazardous, and it was safer for workers to use the tool shown in the e-

mail.  Exhibit 10, Ashdown Dep. at 44.  According to Mr. Ashdown,

> it was a photograph of a guy holding out a rattlesnake, a dead one, using, like litter
> grabbers, these things that you use without bending over . . . to pick up trash. . . At
> that time I was trying to send a loud and clear message about the ergonomic
> advantages of using those types of grabbers to pick up trash in the park.  Because
> now they are using these picker sticks with a nail on the end of it. . . I was using
> every opportunity I could to push changeover to use [one] of those types of litter
> grabbers.

Id. at 44.  Moreover, one can use "litter grabbers . . . to lift really heavy objects . . . in order to

throw [them] away."  Id. at 45.

　　　　According to Stephen Syphax, Supervisory Resource Management Specialist, he has

8

had e-mail exchanges with Tony Ashdown where he would send attachments and pictures of things.  But it usually was safety-related, even though it might be wild safety-related. . . "[I]t's not unusual to get attachments to e-mails because Tony, he writes a lot, he has links with all these other safety officers throughout the country and he's always sending out things that might not be specifically Central [Region] related.  So, if it was a snake and it was some issue about poisonous snakes, or something like that, I could see that happening.

Exhibit 13, ROI, Deposition of Stephen Syphax ("Syphax Dep.") at 20-21.

Finally, according to Anthony Ashdown the-mail was not directed or intentionally sent to Plaintiff as a threat.

[i]t must have been maybe about that time when [Plaintiff] started getting access to e-mail.  And coincidentally, that was one of the first things that he probably pulled up.  But . . . I have been sending these things out for  - - ever since I have been here, and he's the first one that has ever complained.

Exhibit 10, Ashdown Dep. at 46-47.  Moreover, despite Plaintiff's contention, nowhere in the e-mail message does it read, "[T]his is what happens to snitches in the National Park Service."  See Exhibit 5.  Clearly, then, Plaintiff was not harassed when he received this e-mail.

With respect to the harassment allegations in Claims C and G, Plaintiff asserts that he was harassed when he reported the existence of defective equipment, and "demanded to work in a safe environment."  Complaint at 6.  However, sometime before August 21, 2005, Plaintiff was instructed to clean the interior and exterior walls of the Lincoln Memorial.  See Exhibit 2.  His supervisor, Jesse Mallard, gave him the assignment.  See Exhibit 4, Mallard Dep. at 8.  Plaintiff did not express any concerns about the assignment being hazardous to him, his crew or the public.  Id. at 9.  In fact, Mr. Mallard previously had given Plaintiff this assignment.  Id.

On August 25, 2005, Plaintiff gave his supervisor, Jesse Mallard, a list of supplies needed to complete the task.  See Exhibits 7, 8.  On August 31, 2005, the supplies were purchased, and on September 2, 2005, they were given to Plaintiff.  See Exhibit 8.  Approximately one week

later, Plaintiff was asked to get started with washing the walls.  Plaintiff indicated that he "didn't

know where the equipment was because Tony Donald had it."  Plaintiff was told to meet with

Mr. Donald to locate the equipment and complete the job.  Id.  On September 29, 2005, Jennifer

Talken-Spauling, Cultural Resource Specialist, National Park Service, complained to Mr.

Mallard about the condition of the Lincoln Memorial.  Id.  Mr. Mallard informed Plaintiff of the

complaint.  Plaintiff claimed that he did not have the staff to do the job.  Id.  On October 3, 2005,

Stephen Lorenzetti, then Acting Superintendent at National Mall and Memorial Parks, GS-15,

told Mr. Mallard to inform Plaintiff that the job must be completed by October 6, 2005.  Mr.

Mallard sent Plaintiff an e-mail informing him of such.  Id.  On October 6, 2005, Mr. Lorenzetti

called Mr. Mallard to find out why the job was not done.  In turn, Mr. Mallard asked Plaintiff

why it was not done.  Plaintiff said that Mr. Lorenzetti told him not to do it.  Mr. Mallard called

Mr. Lorenzetti to inform him of what Plaintiff had said.  Mr. Lorenzetti said that he did not

instruct Plaintiff not to complete the job.  Id.

On October 28, 2005, Mr. Mallard inspected the Lincoln Memorial and learned that the

job was not complete.  See Exhibit 3.  Mr. Mallard sent Plaintiff an e-mail indicating that he had

gotten many complaints about the condition of the memorial.  Mr. Mallard requested that the job

be completed by November 17, 2005.  Id.

On November 7, 2005, Plaintiff reported to Rose Capers-Webb, Regional Safety

Manager, that "he felt that he was being made to perform some activities that he felt [were]

unsafe . . . ."  See Exhibit 12, Capers-Webb Dep. at 7-8.  Specifically, Plaintiff reported that he

had to wash down the walls of the Lincoln Memorial using large amounts of water which would

be unsafe to him and the public.  Id. at 8.  He also complained that he did not have the manpower

10

necessary to do the work or use the forklift.  Id.  Ms. Capers-Webb informed Plaintiff that she

would contact Plaintiff's safety manager, Mr. Ashdown.  Id. at 9.

While Plaintiff claimed that "management dismissed his assertion of unsafe work

assignments[,]" Exhibit 1 at 2, that day Ms. Capers-Webb and Mr. Ashdown went to the work

site.  Exhibit 12, Capers-Webb Dep. at 9-10.  As a result, the forklift was taken out of service.

Id. at 12.  In addition, an inspector was sent out to examine the equipment.  See Exhibit 10,

Ashdown Dep. at 23-24.

Although Plaintiff claimed that he was harassed by management when he reported the

defective equipment on November 7, 2005, Plaintiff presents no evidence to suggest that he was

harassed by management after his report.  Plaintiff was assigned the task of washing the walls of

the Lincoln Memorial sometime before August 21, 2005.  See Exhibit 2.  In late October of 2005,

the work was still not completed.  See Exhibit 3.  Therefore, management had every right

repeatedly to request that the work get done, particularly in light of the fact that management was

receiving complaints about the condition of the memorial.  After Plaintiff's report, the defective

equipment was taken out of service.  Plaintiff makes no mention of a continuing request to

complete the job at that point.

With respect to the harassment allegation in Claims D and F, Plaintiff states that he was

harassed by Mr. Ashdown for "redressing a grievance" against two employees who allegedly

used a government computer to visit pornographic sites.[2]  See Complaint at 3, 6.  Specifically, at

_____

[2]In Claim F, Plaintiff did not specifically state the grievances he attempted to redress.  However, throughout the Complaint, Plaintiff states that he was unable:
  1- "to redress a grievance against two (2) employees for the inappropriate use of the government's computer on government time[,]" Complaint at 5 (Claim A);
  2- "to redress a grievance[] against two employees that misused government time and

11

a general meeting, with Jesse Mallard, Anthony Ashdown and Stephen Syphax, Supervisory

Resource Management Specialist, Plaintiff made the allegation that two named individuals had

used a government computer to view pornographic sites.  See Exhibit 4, Mallard Dep. at 20.  Mr.

Ashdown believed that it was "a serious, condemning remark or comment[,]" and cautioned

Plaintiff about making such statements in front of others.  See Exhibit 9 at 1.  Mr. Ashdown also

told Plaintiff that "[i]f [he] ha[d] evidence or witnesses to support [the] allegations[, Plaintiff

should] formally address the matter with [Mr. Mallard] so it c[ould] be thoroughly investigated

and action taken."  Id. at 2.  Moreover, after Plaintiff made the allegation, management asked that

an Internet Technology/Computer Specialist examine the computer.  The specialist did so, and

determined that the allegation was untrue.  See Exhibit 4, Mallard Dep. at 20-21.  While Plaintiff

was warned that he had made a serious allegation, this response does not constitute harassment.

A review of the allegations of harassments in Claims A, C, D, F and G reveals that

Plaintiff cannot establish that he was harassed at all.  However, assuming *arguendo* that Plaintiff

could establish that he was harassed, the conduct about which Plaintiff has complained did not

create a hostile work environment.  The conduct was not severe or physically threatening, and did

not interfere with Plaintiff's performance.  Clearly, there is nothing that suggests that the

workplace was permeated "with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an

abusive working environment."  Barbour, 181 F.3d at 1347-48 (quoting Oncale, 523 U.S. at 78).

---

equipment (computer) to visit porn sites[,] id. at 6 (Claim D); and
3- "to redress a grievance without his Manager . . . threatening his life" after reporting the
"inappropriate use of the government's computer."  Id. at 5-6 (Claim H).
Therefore, in Claim F, Plaintiff appears to complain about management's conduct when he
reported the alleged improper use of the computer.

Because Plaintiff's claims of harassment are wholly without merit, they should be dismissed. See Fed. R. Civ. P. 12(b)(6).[3]

**B.  Plaintiff Has Failed to Establish That He Was Subjected to Retaliation.**

In Claim D of Plaintiff's Complaint, he asserts that he was denied his "right . . . to redress a grievance[] against two employees that misused government time and equipment (computer) to visit porn sites on the internet, without fear of *reprisal* . . . ."  Complaint at 6 (emphasis added). In Claim F, he asserts that he was denied "the right to exercise his First Amendment right to redress his grievances to his Supervisor and Management without fear of . . . *retaliation*."  Id. (emphasis added); see supra at n.2.  These claims must fail.  Importantly, in each of these claims, Plaintiff does not state that he was retaliated against, only that he was denied the right to redress a grievance without *fear of* retaliation.  See Complaint at 6.  Moreover, Plaintiff improperly brought these claims pursuant to 42 U.S.C. § 1983.  However, even if Plaintiff properly had brought these claims under Title VII, he would be unable to establish that he was the victim of retaliation.

A prima facie case alleging retaliation under Title VII is established when an employee demonstrates that (1) he engaged in protected behavior; (2) a reasonable employee would have found the challenged action materially adverse; and (3) there is a causal link between the protected activity and the materially adverse action.  Baloch v. Norton, No. 03-1207, 2007 WL 2774507, at *5 (D.D.C. 2006) (citing Burlington N. & Santa Fe Ry Co. v. White, 126 S.Ct. 2405, 2415-16 (2006) (additional citations omitted).  If the employee is able to establish a prima facie case of retaliation, the analysis then follows as that for a discrimination claim, i.e., the employer

---

[3]There are additional bases for the dismissal of Claims A and F.  See infra at 14-17.

must introduce evidence of a legitimate, non-retaliatory reason for its action, see McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and the employee must prove that the employer's proffered reason was not the true reason, but was a pretext for retaliation, and that the employee's membership in a protected class was the true reason for the employment action.  Id. at 508; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Aka v. Washington Hosp. Center, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998) (en banc);  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1554 (D.C. Cir. 1997); Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

        Plaintiff engaged in prior protected behavior when he filed Equal Employment Opportunity Complaints on January 5, 2004 and January 27, 2005.  See Exhibit 14 (Chart of Employees Who Have Filed EEO Complaints, 2003-present).  See Forkkio v. Powell, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002)(an activity is protected as long as "it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against alleged treatment"). However, Plaintiff cannot establish the second prong of the test - -  that a reasonable employee would have found the challenged action materially adverse.

        The second prong of the test "seeks to . . . prohibit [] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' and the courts, and their employers."  Baloch, 2007 WL 2774507, at * 6 (citing Burlington N. & Santa Fe Ry Co., 126 S.Ct. at 2415).  However, "[t]he law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'"  Id.  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  Id.  In addition, "[n]ot everything that makes an employee unhappy is an actionable adverse action. . . ."  Russell v.

14

<u>Principi</u>, 257 F.3d 815, 818 (D.C. Cir. 2001); <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C.

Cir. 2006).  "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public

humiliation, or loss of reputation, are not adverse actions."  <u>Nichols v. Truscott</u>, 424 F.Supp.2d

124, 136 (D.D.C. 2006).

 While Plaintiff complains that he was denied a right to redress a grievance, this claim is

untrue.  Plaintiff did report the alleged improper use of the government computers.  As a result,

the computers were examined and found to have not been used as Plaintiff had stated.  However,

even if plaintiff were denied the right to redress this grievance, there is no evidence in the record

to establish that a reasonable employee would have found the challenged action materially

adverse, nor that Plaintiff suffered any injury or harm.  Moreover, because this action was not

adverse, the Court does not have to reach the question of whether this action was taken in

response to Plaintiff's filing the Equal Employment Opportunity Complaints.  <u>See</u> <u>Baloch</u>, 2007

WL 2774507, *6, n.7.

 **C.  Plaintiff's Constitutional Claims Must Be Dismissed.**

  1- <u>Plaintiff's Claims Under 42 U.S.C. § 1983 Must Fail.</u>

 In Claims A and F of Plaintiff's Complaint, he asserts that his "First Amendment rights to

redress a grievance" were violated.  Complaint at 5-6.  Similarly, in Claim H, Plaintiff asserts

that his right to redress a grievance without his manager threatening his life was violated.  <u>See</u> <u>id</u>.

at 6.

 In Claim B, Plaintiff asserts that his Fifth Amendment due process rights to have the

Department of Interior's Equal Employment Opportunity office investigate his complaint within

180 days were violated.  <u>Id</u>. at 5-6.  Similarly, in Claim E, he asserts that his Fifth Amendment

15

right to have his complaint investigated "within 180 days without undo (sic) interference from Management" was violated. Id. at 6. All of Plaintiff's constitutional claims should be dismissed.

In this action, Plaintiff sues Dirk Kempthorne, Secretary, U.S. Department of Interior, in his official capacity. See id. at 1. Plaintiff states that this Court has jurisdiction over his claims "under Title 42 Sec. 1983." See id. at 2. However, "to state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (emphasis added). "The traditional definition of acting under color of state law requires that the defendant in a §1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Id. at 49. See Abramson v. Bennett, 707 F. Supp. 13, 16 (D.D.C. 1989), aff'd 889 F. 2d 291 (D.C. Cir. 1989) ("Section 1983 only applies to state officials acting under color of state law" not federal officials acting under color of federal law); Heck v. Humphrey, 512 U.S. 477 (1994) (stating that section 1983 provides access to a federal forum for claims of unconstitutional treatment at the hands of state officials); and Williams v. United States, 396 F.3d. 412 (D.C. Cir. 2005) (private policeman employed by the U.S. Printing office did not act under color of District of Columbia law when he made an arrest for disorderly conduct). Here, Plaintiff cannot show the deprivation of any right committed by a person acting under color of state law. Dirk Kempthorne is a federal officer, acting under the authority of federal law. Therefore, Section 1983 is inapplicable, and Claims A, B, E, F and H against Dirk Kempthorne must be dismissed. See Fed. R. Civ. P. 12(b)(6).

The National Park Service also may not be sued under 42 U.S.C. § 1983. "It is axiomatic

16

that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983). See  FDIC v. Meyer, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." Meyer, 510 U.S. at 475.  Congressional consent to suit in this Court, a waiver of the government's traditional immunity, must be explicit and strictly construed.  Library of Congress v. Shaw, 478 U.S. 310, 318 (1986).  Absent clear congressional consent to entertain a claim against the United States, the District Court lacks authority to grant relief.  United States v. Testan, 424 U.S. 392, 399 (1976).  Thus, Plaintiff's § 1983 claims against the National Park Service must be dismissed. See Fed. R. Civ. P. 12(b)(1).

### 2.  Plaintiff's First and Fifth Amendment Claims Must Fail.

In Claims A and F, Plaintiff asserts that his First Amendment right to redress a grievance regarding the alleged improper use of the government computer was violated.  See Complaint at 5-6.  It is well settled that the First Amendment prevents the government from proscribing speech, or even expressive conduct, based upon the content of the message conveyed.  See, e.g., Texas v. Johnson, 491 U.S. 397 (1989).  However, Plaintiff has failed to establish that he has been denied a right to make his grievance.  In fact, at a meeting, Plaintiff reported to management that two employees allegedly were using the computer improperly.  After making this report, management had the Internet Technology/Computer Specialist examine the computer, and it was determined that Plaintiff's report was unfounded.  See Mallard Dep. at 20-23.  Because Plaintiff's First Amendment claim is wholly without merit, it must be dismissed.  See Fed. R.

17

Civ. P. 12(b)(6).[4]

Plaintiff also states that the failure of the Department of Interior to investigate his Equal

Employment Opportunity claim within 180 days violated his due process rights under the Fifth

Amendment.  See Complaint at 5-6 (Claims B and E).  The fundamental requirement of due

process is the opportunity to be heard "at a meaningful time and in a meaningful manner."

Mathews v. Eldridge, 424 U.S. 319, 333 (1972).  Plaintiff's allegation of denial of due process is,

on its face, insufficient to support a cause of action upon which relief can be granted.

Plaintiff was not denied an opportunity to be heard when the Agency did not complete the

investigation within 180 days.  The federal regulations contemplate that an Agency might not

complete the investigation within that time frame, and provide safeguards specifically designed

to protect the rights of employees.  The regulations specifically provide that an employee has the

right to request a hearing before the Equal Employment Opportunity Commission and move

jurisdiction of his claims from the Agency to the Commission if an investigation is not

completed in a timely manner.  29 C.F.R. § 1614.108(g)("the complainant has the right to request

a hearing before an EEOC Administrative Judge after 180 calendar days from the filing of a

formal complaint . . . ").  Furthermore, an employee has the right to raise his claims in federal

court if his claims are still pending 180 days after filing his formal complaint. 42 U.S.C. §

2000e16(c); 29 C.F.R. § 1614.107(a)(3).

Plaintiff was not denied the opportunity to be heard.  His claims were not dismissed.

---

[4]See Garcetti v. Ceballos, 126 S.Ct. 1951, 1960 (2006)("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.")

Rather, Plaintiff exercised his right to move his claims to an EEOC Administrative Judge according to the established process.[5]  Plaintiff then voluntarily chose to dismiss his EEO complaint and proceed by way of this action in District Court.  See Exhibit 15 (Memorandum to EEO from Plaintiff, dated January 31, 2007).

Moreover, an alleged failure to process an EEO claim properly is not actionable under Title VII.  Stewart v. Evans, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (dissatisfaction with agency's handling of EEO complaint is not an adverse action); Kilpatrick v. Riley, 98 F. Supp. 2d 9, 24 (D.D.C. 2000) ("untimely decision on . . .1997 EEO complaint does not constitute an actionable adverse personnel action within the meaning of Title VII"); Packer v. Garrett, 735 F. Supp. 8, 9-10 (D.D.C. 1990) (only "right" Title VII establishes is to be free of discrimination; this right is served even if errors are made in processing the charge, by the right to a trial de novo), aff'd, 959 F.2d 1102 (D.C. Cir.) (table), cert. denied, 506 U.S. 1036 (1992); Young v. Sullivan, 733 F. Supp. 131, 132 (D.D.C. 1990) ("Title VII creates only a cause of action for discrimination.  It does not create an independent cause of action for the mishandling of an employee's discrimination complaints."), aff'd, 946 F.2d 1568 (D.C. Cir. 1991) (table), cert. denied, 503 U.S. 918 (1992).  Accordingly, Claims B and F must fail.  See Fed. R. Civ. P. 12(b)(6).

---

[5]Although the investigation was not completed within 180 days, Plaintiff was given the opportunity to participate in this EEO investigation, but chose not to do so.  The Agency complied with the EEOC's request for documents, and other Agency employees fully participated in the investigation.

**IV.  CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss this action or, in the alternative, grant Defendants' motion for summary judgment.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. Bar #435409
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
202-514-6531
Attorneys for Defendants

20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAYMOND GRESHAM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0752 (JR)** |
| **DIRK KEMPTHORNE, Secretary,** | ) |
| **U.S. Department of Interior,** | ) |
| **NATIONAL PARK SERVICE,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 19th day of November, 2007, I caused service

of the foregoing to be made by mailing a copy thereof to:

Raymond Gresham
7060 Eastern Avenue, N.W., #216
Washington, D.C.  20012

_____/s/_____
MARIAN L. BORUM
Assistant United States Attorney

21

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAYMOND GRESHAM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0752 (JR)** |
| **DIRK KEMPTHORNE, Secretary,** | ) |
| **U.S. Department of Interior,** | ) |
| **NATIONAL PARK SERVICE,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## <u>ORDER</u>

       This matter is before the Court on Defendants' Motion to Dismiss, or in the Alternative, for

Summary Judgment.  Upon consideration of this Motion and the entire record of this case, it is this

_____ day of _____, 200__,

       **ORDERED** that Defendant's Motion to Dismiss should be and hereby is GRANTED.


_____
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAYMOND GRESHAM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0752 (JR)** |
| **DIRK KEMPTHORNE, SECRETARY,** | ) |
| **U.S. Department of Interior,** | ) |
| **National Park Service,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**<u>ORDER</u>**

This matter is before the Court on Defendants' Motion to Dismiss, or in the Alternative, for

Summary Judgment.  Upon consideration of this Motion and the entire record of this case, it is this

_____ day of _____, 200___

**ORDERED** that Defendants' Motion for Summary Judgment should be and hereby is

GRANTED.

_____
UNITED STATES DISTRICT JUDGE

Copies to:

       Marian L. Borum
       Assistant United States Attorney
       Judiciary Center Building
       555 Fourth Street, N.W., - Civil Division
       Washington, DC  20530

       Raymond Gresham
       7060 Eastern Avenue, N.W., #216
       Washington, D.C.  20012

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 1

# REPORT OF INVESTIGATION

# EQUAL EMPLOYMENT OPPORTUNITY

# DISCRIMINATION COMPLAINT

## OF

## RAYMOND GRESHAM, JR.

## DOCKET NUMBER FNP-2006-058



**Conducted by**
**Carl Bradley, Jr. & Associates**
**728 6th Street S.W., Suite 103**
**Washington, DC 20024**

# U.S. DEPARTMENT OF THE INTERIOR
# NATIONAL PARK SERVICE

## REPORT OF INVESTIGATION
## EQUAL EMPLOYMENT OPPORTUNITY  DISCRIMINATION COMPLAINT

**COMPLAINANT:**      **RAYMOND GRESHMAN, JR.**

**DOCKET NUMBER:**    **FNP-2006-058**

## I.    COMPLAINANT INFORMATION

### A.    Title, Grade, and Location of Complainant's Position:

Maintenance Worker Supervisor, WS-3
Memorial Crew
Division of Resource Management (DRM)
National Mall and Memorial Parks (NMMP)
National Capital Region (NCR)
National Park Service (NPS)
U.S. Department of the Interior (DOI)
Washington, DC 20005

### B.    Complainant's Address:

7060 Eastern Avenue, N.W., #216
Washington, D.C. 20012

### C.    Representative's Name and Address:

None

## II.    DESCRIPTION OF COMPLAINT

### A.    Name and Location of Agency and Unit Involved in the Complaint:

DRM, NMMP, NCR
NPS, DOI
Washington, D.C.

**B.    Nature of Actions, Decisions, or Conditions Giving Rise to the Complaint:**

Forced to work in unsafe manner; dismissal of claims of unsafe assignments; questioning work assignments; criticized by management; threatening e-mail; and verbal abuse

**C.    Kind of Discrimination Alleged:**

Race; color; reprisal; hostile work environment; and harassment

**D.    Dates of Alleged Discrimination:**

November 7, 2005; November 21, 2005; November 23, 2005; November 29, 2005; and December 28, 2005

## III.    DESCRIPTION OF ACCEPTED CLAIMS

Complainant alleges that he was discriminated against based on race (African American), color (Black), reprisal (prior EEO activity), and subjected to a hostile work environment and harassment (non-sexual) when:

a.    On November 7, 2005, he was compelled to work in an unsafe manner;

b.    On November 7, 2005, management dismissed his assertions of unsafe work assignments;

c.    On November 21, 2005, management questioned his work assignments;

d.    On November 23, 2005, he informed management of questionable computer use by other employees, and was criticized for the action;

e.    On November 29, 2005, he received an electronic mail message

that he felt was threatening;

g.    On December 28, 2005, he was subjected to verbal abuse;

## IV.    RELIEF REQUESTED BY COMPLAINANT

End harassment, hostile work environment and reprisal; monetary damages; compensation for pain and humiliation; cease threats to terminate; disciplinary actions against management; and not to move his crew from the Brentwood Facility to Grounds

## V.    DESCRIPTION OF INVESTIGATION

### A.    Investigator:

Carl Bradley, Jr.
Carl Bradley, Jr. & Associates
728 6th Street, SW, Suite #103
Washington, DC  20024

### B.    Date Case Assigned to Investigator:

January 19, 2007

### C.    Dates of Investigation:

February 2, 2007 – March 7, 2007

### D.    Places of Investigation:

Washington, D.C.

### E.    Date Report of Investigation Submitted:

March 9, 2007

## VI.    BACKGROUND AND SUMMARY OF FINDINGS

Raymond Greshman, Jr., hereinafter referred to as Complainant, is currently employed as a Maintenance Worker Supervisor, WS-3, with the

Memorial Crew, DRM, NMMP, NCR, NPS, Washington, D.C. Complainant timely filed a formal complaint of discrimination against NPS on March 31, 2006 **(Exhibit 1).** By letter, dated April 11, 2006, the NPS Equal Opportunity Office acknowledged receipt of the complaint **(Exhibit 2).** By letter, dated, November 28, 2006, claims 1a, 1b, 1c, 1d, 1e, and 1g were accepted for investigation, and claims 1f and 1h were recommended for dismissal for failure to state a claim under 29 CFR, Section 1614.103 **(Exhibit 4).**

## Investigator's Note:

Complainant was scheduled to be interviewed on February 5, 2007, in order to obtain his testimony about the accepted claims. On the morning of the scheduled interview, Complainant presented the Investigator with two (2) typed memoranda. In one memorandum, dated January 30, 2007, Mr. E. Ned Sloan, who had been designated as Complainant's representative, indicated that he was no longer Complainant's attorney, effective July 5, 2006 **(Exhibit 6B).** In the second memorandum from Complainant, dated January 31, 2006, Complainant indicated that, because the Agency had not investigated his complaint within the 180 days stipulated in 29 CFR 1614.108(e), he was requesting dismissal of his complaint so that he could pursue the matter in U.S. District Court **(Exhibit 6A).** Complainant verbally informed the Investigator that he would not be providing testimony for the scheduled interview. The Investigator forwarded both documents to the NPS Equal Opportunity Office, and was advised to continue with the investigation of the complaint, absent Complainant's testimony. Information pertaining to the specific claims is based on the Investigator's review of the EEO Counselor's Report **(Exhibit 3)**, and the formal complaint of discrimination **(Exhibit 1)**.

## _Prima Facie Case_

**Complainant carries the initial burden of establishing a _prima facie_ case of discrimination.**

## Claim 1a

It is Complainant's contention that, on November 7, 2005, he reported to Ms. Rose Capers, Safety Manager, that he was being forced to wash the interior and exterior walls at the south end of the Lincoln Memorial. Complainant contends this assignment was unsafe for his crew and the

visiting public. Complainant contends he had previously expressed these safety concerns to management, but no action was taken to address his concerns.

## Claim #1b

Complainant contends that, on November 7, 2005, management dismissed his assertions of an unsafe working conditions associated with washing the walls at the Lincoln Memorial. Complainant contends that Mr. Anthony Ashdown, Safety Manager, NMMP, responded to Ms. Capers that there was no work performed by Complainant and his crew that involved a Job Safety and Health Analysis.

## Claim 1c

It is Complainant's contention that, on November 21, 2005, he met with Mr. Jesse Mallard, Preservation Work Supervisor, Mr. Stephen Syphax, then Acting Chief, DRM, and Mr. Anthony Ashdown, Safety Manager, NMMP, in order to discuss work and other related matters. Complainant contends that Mr. Ashdown pointed out several inconsistencies in work assignments Complainant had previously reported as having been completed.

## Claim 1d

Complainant contends that, on or about November 23, 2005, he advised Mr. Mallard and Mr. Ashdown that some of Mr. Mallard's crew were viewing pornography on the computer at the workplace. Complainant contends that he was criticized by Mr. Ashdown for making those allegations in the presence of other employees, and advised that such allegations could result in some legal action.

## Claim 1e

Complainant contends that, on or about November 29, 2005, he received an e-mail message from Mr. Anthony Ashdown which contained a picture of a dead snake. Complainant contends that he perceived the picture to be a death threat against him because he reported that Mr. Mallard's employees were viewing pornography on the computers at work. Complainant contends this is another example of the continued harassment and retaliation against him.

## Claim 1g

Complainant contends that, on December 28, 2005, he was called to a meeting to discuss an incident involving a member of his crew who had been assaulted by another employee. Complainant contends that he and his crew member were subjected to verbal abuse by Mr. Ashdown based on race. The formal complaint did not specify how Complainant was verbally abused. Complainant contends that he was unable to resolve any issues regarding the harassment and hostile work environment, and he was unable to communicate with the Office of the Inspector General.

## Management's Response

*Once a prima facie case of discrimination has been established, management has the burden of articulating a legitimate, non-discriminatory reason for the matter giving rise the complaint.*

## Claim 1a

**Jesse Mallard, Jr.** (race/African American; color/black), Statue Preservation Supervisor, WS-8, NMMP, states **(Exhibit 7)** he is Complainant's immediate supervisor, and he was responsible for giving Complainant the assignment to wash down the interior and exterior walls of the Lincoln Memorial. Mr. Mallard states Complainant had previously been given the same assignment, which is normally done twice a year. Mr. Mallard states Complainant never previously complained to him about the assignment being unsafe for him or his crew. Mr. Mallard states Mr. Anthony Ashdown, the Safety Officer for NMMP, told him that Complainant had reported some unsafe issues to Ms. Rose Capers-Webb, the Safety Officer for NCR. Mr. Mallard states Mr. Ashdown was not aware of the specific safety hazards, so they met with Complainant in an effort to identify them. Mr. Mallard states Complainant did not provide any information to them, so he and Mr. Ashdown visited the site and conducted an inspection. Mr. Mallard states they discovered there was a cracking with one of the wells on the side of the scaffold, however, the scaffold did not have anything to do with Complainant's crew washing down the walls because it could have been done without using the scaffold. Mr. Mallard states Complainant completed the assignment, and has done it again since that time. Mr. Mallard states he and Mr. Ashdown inspected the lift later and discovered there was a problem with it. Mr. Mallard states the lift was subsequently repaired. Mr. Mallard states no consideration was given to race or color in giving this assignment to

Complainant, nor was it given to Complainant in order to harass him. Mr. Mallard states Complainant was given the assignment because it was his job. Mr. Mallard states he was involved in Complainant's prior EEO complaints, however, the assignment was not given to Complainant in order to retaliate against him because of his prior EEO activity.

**Stephen W. Syphax** (race/African American; color/black), Supervisory Resource Management Specialist, GS-13, National Capital Parks-East, NCR, NPS, states **(Exhibit 8)** he was detailed to the position of Acting Chief, DRM, sometime in mid-November 2005, and he was not present when these claims were raised. Mr. Syphax states Mr. Jesse Mallard may have mentioned these concerns to him when he was being oriented as the Acting Chief, DRM. Mr. Syphax states he did not have any discussions with Complainant at any time about being given unsafe assignments, or having to work in an unsafe manner.

**Anthony K. Ashdown** (race/Caucasian; color/white), Safety Manager, GS-11, NMMP, states **(Exhibit 9)** he was not responsible for giving Complainant the assignment to wash the walls at the Lincoln Memorial. Mr. Ashdown, if an NMMP employee has a complaint about an unsafe work condition, the employee should report it to the immediate supervisor and, if there is no resolution, he would get involved to investigate the matter. Mr. Ashdown states Complainant did not contact him about any safety issues. Mr. Ashdown states he was contacted by Ms. Rose Capers-Webb, Safety Officer, NCR, and informed about a potential problem at the Lincoln Memorial. Mr. Ashdown states he and Ms. Capers-Webb went to the work site to investigate the matter. Mr. Ashdown states there were some problems with the mobile scaffold, and it was obvious that the employees did not know how to raise it correctly. Mr. Ashdown states the mobile scaffold was defective, so it was tagged out of service until it could be inspected.

## Claim 1b

**Jesse Mallard** states **(Exhibit 7)** Complainant never did tell him or Mr. Ashdown what were the specific safety hazards associated with Complainant's crew having to wash the interior and exterior walls at the Lincoln Memorial. Mr. Mallard states he never spoke with Ms. Capers-Webb regarding any specific safety concerns raised by Complainant. Mr. Mallard states Mr. Ashdown spoke with Ms. Capers-Webb and subsequently met with Complainant to identify those concerns. Mr. Mallard states it was not until he and Mr. Ashdown visited the Lincoln

Memorial and inspected the site that they discovered a problem with the forklift. Mr. Mallard states he does not know whether Mr. Ashdown provided any specific response to Complainant regarding the assignment of washing the walls posing any unsafe or hazardous condition to Complainant, his crew or the visiting public. Mr. Mallard states he and Mr. Ashdown discovered a problem with the lift, which was subsequently repaired. Mr. Mallard states he and Mr. Ashdown also discovered a crack with one of the wells on the side of the scaffold, but that was not needed to wash down the walls. Mr. Mallard states Complainant had never previously voiced any concerns about any safety hazards associated with washing down the walls at the Lincoln Memorial. Mr. Mallards states there was no effort by management to dismiss any safety concerns raised by Complainant. Mr. Mallard states an effort was made to have Complainant identify any specific safety hazards that need to be resolved. Mr. Mallard states no consideration was given to race, color, harassment or retaliation. Mr. Mallard states he is not aware of any effort to subject Complainant to a hostile work environment.

**Anthony Ashdown** states **(Exhibit 9)**, on November 7, 2005, Ms. Rose Capers-Webb informed him that Complainant contacted her about some possible safety problems at the Lincoln Memorial. Mr. Ashdown states they visited the work site and discovered there were problems with the Mobile scaffold. Mr. Ashdown states apparently they were standing on a rickety scaffold in order to wash down the walls, and they were not trained to  operate it properly. Mr. Ashdown states they inspected the mobile scaffold, he determined it was defective, so it was tagged and taken out of service until it could be properly inspected. Mr. Ashdown states an outside inspector came and inspected the mobile scaffold unit on November 28, 2005. Mr. Ashdown states it was determined that the equipment was too old, and replacement parts could not be located. Mr. Ashdown states the scaffold was completely removed from service. Mr. Ashdown states there was also a problem with the floor scrubbers not working properly, so he requested copies of work orders pertaining to the maintenance of that equipment. Mr. Ashdown states no preventive maintenance program was being used, rather calls were made for repairs whenever they were needed. Mr. Ashdown states he was asked if there was any work performed by Complainant's crew that involved a job safety and health analysis. Mr. Ashdown states he also learned that DRM never implemented a job hazard analysis performed for any of the work activities performed at NMMP.

Mr. Ashdown states, in his opinion, action was taken to address the safety issues. Mr. Ashdown states equipment was inspected and removed from

service.  Mr. Ashdown states Complainant refused to meet with Mr.
Mallard to discuss any safety issues.  Mr. Ashdown states it is obvious
there was some conflict between Complainant and Mr. Mallard, and safety
issues were raised in order to not perform assignments.

## Claim 1c

**Jesse Mallard** states **(Exhibit 7)** he has no knowledge of meeting with
Complainant, Mr. Ashdown or Mr. Syphax regarding any inconsistencies
with work assignments Complainant may or may not have completed.  Mr.
Mallard states Mr. Ashdown is not responsible for giving an work
assignments to Complainant, and he is not aware of Mr. Ashdown
complaining about any inconsistencies with assignments Complainant said
were completed, but had not.  Mr. Mallard states he has no recollection of
Complainant being questioned about any of his work assignments.  Mr.
Mallard states Complainant usually completes any work assignments given
to him.

**Stephen Syphax** states **(Exhibit 8)** he has no specific recollection of
any meetings when Mr. Ashdown questioned work assignments that
Complainant said were completed, when they had not.  Mr. Syphax states
Mr. Ashdown did not given work assignments to Complainant.  Mr. Syphax
states Mr. Ashdown was involved in a looking at a lot of the safety
operations at the Park and making recommendations fro improving safety
issues.  Mr. Syphax states Mr. Ashdown may have made some
arrangements with Complainant to do something related to a safety issue,
but he has no recollection of Mr. Ashdown expressing any concern about
Complainant not completing anything related to a safety issue, except
possibly the matter of the operation of the lift.

**Anthony Ashdown** states **(Exhibit 9)** he has not given, nor does he
have the authority to give any assignments to Complainant.  Mr. Ashdown
states he does not have any specific recollection of complaining during a
November 21, 2005, meeting about any inconsistencies with work
Complainant previously indicated as being completed.  Mr. Ashdown
states he did make an observation to Mr. Mallard about the quality of the
work performed at the Lincoln Memorial.  Mr. Ashdown states the work
crew using the floor scrubbers left debris all around, and it appeared that
the floors had not been mopped.  Mr. Ashdown states he recently
complained to DRM about not doing a good job clearing the ice and snow
away from the doorway to the restrooms at the Lincoln Memorial during
the recent ice storm.

## Claim 1d

**Jesse Mallard** states **(Exhibit 7)** Complainant made a statement during a meeting that members of Mr. Mallard's crew was no working, but instead viewing pornographic material on the office computer. Mr. Mallard states he asked his crew if they had observed any inappropriate material on the office computer, and they denied doing so. Mr. Mallard states he had a computer specialist review the past web sites that were accessed, and it was determined that no inappropriate or pornographic web sites had been visited. Mr. Mallard states some members of his crew were aware that Complainant had accused them of visiting pornographic material on the computer, and they were not happy about the false accusations. Mr. Mallard states neither he, nor any of his crew, criticized or took any action against Complainant because of his false allegations.

**Stephen Syphax** states **(Exhibit 8)** he cannot recall whether it was Complainant or Mr. Mallard, but he was informed about an allegation made regarding members of Mr. Mallard's crew viewing pornographic material on the office computer. Mr. Syphax states he is not certain, but this was an allegation that had been made years ago, and was not a current issue. Mr. Syphax states he does not recall any of the specifics regarding this allegation, other than Mr. Mallard may have told him the Complainant's allegation was investigated and determined to be without merit. Mr. Syphax states he is not aware of anyone criticizing or verbally abusing Complainant for making this allegation.

## Claim 1e

**Jesse Mallard** states **(Exhibit 7)** he cannot recall the specific date, but he was one (1) of approximately fifty (50) employees who received an e-mail from Mr. Ashdown which contained a picture of a dead snake. Mr. Mallard states he cannot recall the specific reason for the e-mail, other than it had to do with something that happened in Texas. Mr. Mallard states the picture of a dead snake was not directed at Complainant for accusing employees of viewing pornographic material on the computer. Mr. Mallard states the e-mail was not sent in order to harass or threaten Complainant in any manner. Mr. Mallard states the e-mail was sent to many employees. Mr. Mallard states he is not aware of Complainant expressing any concerns about the e-mail in question.

**Stephen Syphax** states **(Exhibit 8)** he has received numerous e-mails from Mr. Ashdown, but he has no recollection of receiving an e-mail from him which contained a picture of a man holding a dead snake. Mr. Syphax states Mr. Ashdown has circulated a number of e-mails containing pictures which are related to safety and non-safety issues. Mr. Syphax states he has no recollection of Complainant expressing any concern about feeling threatened by any e-mail sent by Mr. Ashdown.

**Anthony Ashdown** states **(Exhibit 9)** he was responsible for sending an e-mail, dated November 29, 2005, to numerous employees. Mr. Ashdown states the distribution list for the e-mail included employees from other parks, and outside of NPS. Mr. Ashdown states the e-mail contained a picture of a man holding up a dead rattlesnake with a tool used to pick up litter. Mr. Ashdown states the intent of the e-mail was to send a loud message about the ergonomic advantages of using certain types of litter grabbers to pick up heavy trash in the parks. Mr. Ashdown states Complainant was one of many employees who received the e-mail. Mr. Ashdown states the e-mail was not directed as a threat to Complainant for any reason.

## Claim 1g

**Jesse Mallard** states **(Exhibit 7)** he recalls an incident that occurred on or about December 27, 2005, involving an employee who threw a rag in the face of Mr. Mackie Grant, a member of Complainant's crew. Mr. Mallard states Complainant took Mr. Grant to the hospital, and they returned to work. Mr. Mallard states Mr. Syphax called a meeting with Complainant to find out what happened during the incident. Mr. Mallard states he attended the meeting with Complainant and Mr. Syphax. Mr. Mallard states Mr. Ashdown came to the meeting after it had started. Mr. Mallard states it is his understanding that Mr. Ashdown attended the meeting in his capacity as the Safety Officer who was trying to solicit some information about the incident. Mr. Mallard states Complainant objected to Mr. Ashdown being present because Complainant had complained to someone at the Main Interior building about Mr. Ashdown, and he was told not to talk to Mr. Ashdown. Mr. Mallard states Mr. Ashdown attempted to solicit information from Complainant about the incident and Complainant refused to talk to him. Mr. Mallard states Complainant was not compelled to talk to Mr. Ashdown, nor was Complainant verbally abused or harassed by anyone during the meeting. Mr. Mallard states Complainant left the meeting with the permission of Mr. Syphax. Mr. Mallard states they later interviewed Mr. Grant regarding the

rag throwing incident. Mr. Mallard states Mr. Grant said he was the victim, and he was only there)because of the color of his skin.

**Stephen Syphax** states **(Exhibit 8)** he called a meeting to find out what happened during a rag throwing incident between Mr. Mackie Grant, who was a member of Complainant's crew, and an employee from another crew which resulted in an injury to Mr. Grant's eye. Mr. Syphax states Mr. Ashdown, the Safety Officer for NMMP, learned about the incident and asked if he could attend the meeting in order to find out what happened. Mr. Syphax states he agreed to let Mr. Ashdown attend the meeting. Mr. Syphax states the meeting started with Mr. Mallard, Complainant and himself in attendance. Mr. Syphax states Complainant had not immediately reported the incident to Mr. Mallard, and had not completed his written report after Complainant has taken Mr. Grant to the hospital. Mr. Syphax states he, Mr. Mallard and Complainant discussed the incident, and Complainant was advised that Mr. Ashdown would be attending the meeting. Mr. Syphax states Complainant voiced his objection to Mr. Ashdown attending the meeting, and said the Office of the Inspector General told him that he should talk to or have any contact with Mr. Ashdown. Mr. Syphax states Mr. Ashdown arrived at the meeting, and attempted to ask Complainant questions about the incident. Mr. Syphax states he was satisfied with Complainant's explanation to him and Mr. Mallard about the incident, and he did not want to force anything since Complainant indicated he was not supposed to be communicating with Mr. Ashdown. Mr. Syphax states Mr. Ashdown, who was not aware of Complainant saying he was not supposed to communicate with Mr. Ashdown, attempted to pursue his investigation about the incident. Mr. Syphax states Complainant commented again about not having to talk to Mr. Ashdown, and they all ended the meeting. Mr. Syphax states Mr. Ashdown did attempt to question Complainant about the incident, but Complainant did not respond. Mr. Syphax states he ended the meeting because he did not want it to develop into anything negative between Complainant and Mr. Ashdown. Mr. Syphax states he did not consider Mr. Ashdown to be verbally abusive towards Complainant, but it appeared that Complainant perceived Mr. Ashdown to be offensive or adversarial. Mr. Syphax states Mr. Ashdown has an abrupt way of dealing with things and, in hindsight, he should have ended the meeting when Complainant initially indicated that he was advised not to have any contact with Mr. Ashdown. Mr. Syphax states only a few minutes passed between Mr. Ashdown's arrival at the meeting and the immediate termination of the meeting. Mr. Ashdown states he no knowledge or reason to believe Complainant was treated differently, retaliated against, or subjected to a hostile work environment.

**Anthony Ashdown** states **(Exhibit 9)**, in his capacity as the Safety Officer, whenever an employee or a member of the public is injured, he usually investigates the incident. Mr. Ashdown states he usually visits the scene of the incident, obtains statements about what happened, and what could be done to prevent future injuries. Mr. Ashdown states Mr. Syphax told him that he was setting up a meeting to investigate what happened when Mr. Mackie Grant, a member of Complainant's crew, was injured following a rag throwing incident at the Lincoln Memorial. Mr. Ashdown states he asked Mr. Syphax if he could attend the meeting, and Mr. Syphax agreed. Mr. Ashdown states the meeting was already in progress when he arrived. Mr. Ashdown states Mr. Syphax, Mr. Mallard and Complainant were present at the meeting. Mr. Ashdown states he attempted to ask Complainant some questions regarding the incident, but Complainant kept saying he did not have to answer any of his questions. Mr. Ashdown states Complainant said the Office of the Inspector General told Complainant that he did not have to talk to him. Mr. Ashdown states he replied that it was not true because he had spoken to the Inspector General. Mr. Ashdown states Complainant stood up and walked out of the meeting. Mr. Ashdown states Mr. Syphax and Mr. Mallard asked Complainant to stay so they could get some information about the rag throwing incident which resulted in Mr. Grant having to go to the emergency room. Mr. Ashdown states they subsequently met with Mr. Grant to obtain information about the rag throwing incident. Mr. Ashdown states Mr. Grant indicated the only reason he was called to the meeting was because of the color of his skin. Mr. Ashdown states there was no effort by him, Mr. Syphax, or Mr. Mallard to threaten or verbally abuse Complainant. Mr. Ashdown states he was aware of, but not involved with Complainant's prior EEO activity. Mr. Ashdown also states there was no effort to retaliate against Complainant, or subject him to a hostile work environment.


### *Complainant's Rebuttal*

***Once management has articulated a legitimate, non-discriminatory reason for its actions, the burden of proof again shifts to the Complainant to establish that the articulated reason(s) are mere pretext for discrimination.***

Complainant requested dismissal of his complaint in order to pursue his complaint in U.S. District Court, and did not provide any testimony regarding this complaint.

### Relevant Testimony

### Claims 1a and 1b

**Rose M. Capers-Webb** (race/African American; color/black), Regional Safety Manager, GS-13, NCR, NPS, states **(Exhibit 11)** Complainant contacted her on November 7, 2005, and indicated that he was being forced to perform some activities, namely washing the walls at the Lincoln Memorial, which he felt were unsafe to him, his crew, and the general public. Ms. Capers-Webb states Complainant thought the excessive amount of water, possibly frozen, at the memorial, the sidewalks and steps, could be hazardous to employees and visitors. Ms. Capers-Webb states Complainant mentioned not being able to use, or have the manpower necessary to operate the forklift. Ms. Capers-Webb states Complainant also indicated his crew had never done this assignment before, and there were other crews who were supposed to do the job. Ms. Capers-Webb states she is not aware if Complainant had previously expressed the same concerns. Ms. Capers-Webb states she told Complainant she would contact Mr. Ashdown, the Safety Officer for NMMP. Ms. Capers-Webb states she e-mailed and talked to Mr. Ashdown about Complainant's concerns, and they both went to the work site to observe Complainant's concerns. Ms. Capers-Webb states she received an e-mail from Mr. Ashdown and copied to Complainant's supervisor regarding Complainant's concerns. Ms. Capers-Webb states Mr. Ashdown, as the Safety Officer for NMMP, determined that the forklift had to be taken out of service, and Complainant's crew was not qualified or certified to use the forklift. Ms. Capers-Webb states she does not know if Mr. Ashdown talked to Complainant, but Mr. Ashdown did tell that he made several attempts to talk to Complainant, but to no avail. Ms. Capers-Webb states she does not know whether Mr. Ashdown conducted a job safety analysis for the assignment given to Complainant. Ms. Capers-Webb states Mr. Ashdown did send her an e-mail which was copied to Complainant and his supervisor. Ms. Capers-Webb states Mr. Ashdown indicated in the e-mail that he did not know who was responsible for cleaning the Lincoln Memorial and, although a lot of water was used, precautions could be taken to mark off the area during peak visitor hours in order to prevent any hazard to the public. Ms. Capers-Webb states she does not know if Complainant was required to wash the Lincoln Memorial walls after November 7, 2005, but the lift was taken out of service. Ms. Capers-Webb states she did not have access to all the facts, therefore, she has no opinion whether Complainant was forced to work in an unsafe

manner, or whether the assignment was a safety hazard for Complainant, his crew or the visiting public.

**Stephen C. Lorenzetti** (race/Caucasian; color/white), Acting Superintendent, GS-15, NMMP, states **(Exhibit 10)** he was employed as Deputy Superintendent, NMMP, at the time of this complaint. Mr. Lorenzetti states he heard Complainant had some objections to doing a work assignment which he perceived as being unsafe and hazardous to him, his crew and the public. Mr. Lorenzetti states he was not aware of the specifics regarding Complainant's concerns, and had no discussions with Complainant regarding such. Mr. Lorenzetti states he recalls Mr. Stephen Syphax, then Acting Chief, DRM, mentioning Complainant had some concerns, but he cannot recall any specifics. Mr. Lorenzetti states he is not certain, but he recalls that Mr. Syphax was handling the matter. Mr. Lorenzetti states he believes Mr. Anthony Ashdown, the NMMP Safety Officer, was contacted to investigate Complainant's concerns, but he does not know what actions or solutions were developed.

### Claim 1c

**Stephen Lorenzetti** states **(Exhibit 10)** he has no knowledge of Complainant being questioned regarding any inconsistencies with any assignments Complainant had previously reported as being completed, but were not. Mr. Lorenzetti states he has no recollection of having any discussions with Mr. Ashdown regarding any inconsistencies with any of Complainant's work assignments.

### Claim 1d

**Rose Capers-Webb** states **(Exhibit 11)** she received an e-mail from Mr. Ashdown which contained a picture of a man with a dead snake. Ms. Capers-Webb states the e-mail was sent to several employees. Ms. Capers-Webb states the e-mail dealt with the correct way to capture a snake. Ms. Capers-Webb states she has no reason to believe the e-mail was directed as a threat to Complainant. Ms. Capers-Webb states Mr. Ashdown is known to send out a lot of e-mails, some related to work and others did not.

**Stephen Lorenzetti** states **(Exhibit 10)** he has no knowledge of Complainant making any complaints about members of Mr. Mallard's crew viewing pornography or inappropriate material on the office computer.

## Claim 1e

**Stephen Lorenzetti (Exhibit 10)** he only recently heard about Complainant receiving an e-mail containing a picture of a man holding a snake. Mr. Lorenzetti states he never saw the e-mail, and did not have any discussions with Complainant regarding the e-mail. Mr. Lorenzetti states Mr. Ashdown recently mentioned the e-mail, and wondered if it was one of the reasons why Complainant filed a complaint.

## Claim 1g

**Stephen Lorenzetti** states **(Exhibit 10)** he has no knowledge of Complainant being subjected to verbal abuse by any management official. Mr. Lorenzetti states, in his opinion, the relationship between Complainant and Mr. Jesse Mallard is strained. Mr. Lorenzetti states he has not had any discussion with Complainant or Mr. Mallard regarding any of the claims made in this complaint. Mr. Lorenzetti also states he haas no first hand knowledge of the nature of the work relationship between Complainant and Mr. Ashdown. Mr. Lorenzetti states he believes Complainant is not comfortable dealing with Mr. Mallard, but he has no reason to believe Complainant was subjected to a hostile work environment. Mr. Lorenzetti states he was aware of, and involved with Complainant's prior EEO complaints, but he has no reason to believe Complainant was subjected to any harassment or retaliation because of his prior EEO activity. Mr. Lorenzetti also states he has no reason to believe Complainant was treated differently because of his race or color.

## *Other Documentary Evidence*

## Claim 1a

Documentation regarding Complainant's assignment to wash the walls at the Lincoln Memorial is located at **Exhibit 12.** According to documentation provided to the Investigator, the assignment of washing the steps, interior and exterior walls of the Lincoln Memorial was first raised on August 21, 2005, when the assignment was given to Complainant by Mr. Jesse Mallard **(Exhibit 12, pg. 305)**. Mr. Mallard's memo for the record outlining a timeline of events related to this assignment during the period covering August 21, 2005, through October 6, 2005, is located at **Exhibit 12, pg. 306.** A list of supplies requested by Complainant to complete the assignment on August 25, 2005, is located at **Exhibit 12, pg. 307**. Additional e-mails from management,

dated October 3, 2005, and October 12, 2005, regarding Complainant not completing this work assignment are located at **Exhibit 12, pp. 308 - 310**. Complainant's memorandum to management, dated October 16, 2005, regarding his concerns and harassment about completing this assignment are located at **Exhibit 12, pp. 311 - 313**. An e-mail from Mr. Mallard to Complainant, dated November 2, 2005, requesting Complainant to complete the assignment by November 17, 2005, is located at **Exhibit 12, pg. 314**.

## Claim 1b

**Exhibit 9, pp. 223 - 224,** contains an e-mail, dated November 7, 2005, from Ms. Rose Capers-Webb, Safety Officer, NCR, to Mr. Anthony Ashdown, Safety Officer, NMMP, regarding Complainant's concern about being forced to perform an assignment namely, washing the interior and exterior walls at the Lincoln Memorial, which presented a safety hazard for him, his crew and the visiting public. Mr. Ashdown's response, dated November 7, 2005, is located at **Exhibit 9, pp. 222 - 223**. Relevant documentation which provides information regarding management's efforts to address this safety issue is located at **Exhibit 9, pg. 221, and Exhibit 9, pp. 225 - 244.**

## Claim 1c

**Exhibit 9, pp. 232 -234,** contains an e-mail from Mr. Ashdown to Complainant, dated November 23, 2005, regarding the November 21, 2005, meeting when, according to the formal complaint **(Exhibit 1, pg. 20)**, Mr. Ashdown allegedly questioned inconsistencies in work previously reported by Complainant as having been completed.

## Claim 1d

The issue of Complainant informing management of members of Mr. Mallard's crew viewing pornographic material on office computers is addressed in **Exhibit 9, pp. 232 - 233**.

## Claim 1e

**Exhibit 13** contain the e-mail from Mr. Ashdown, dated November 29, 2005, which Complainant claims was threatening. Mr. Ashdown provided a distribution list of NPS employees he sends health and safety related subject matter **(Exhibit 9, pg. 245)**.

## Claim 1g

**Exhibit 14** contains a memo from Stephen Syphax, dated December 28, 2005, regarding the meeting he conducted about the incident at the Lincoln Memorial on December 27, 2005, which resulted in the injury of a member of Complainant's crew. This memo provides Mr. Syphax' recollection of the events of meeting he had with himself, Mr. Jesse Mallard, Complainant, and Mr. Anthony Ashdown. Mr. Ashdown wrote an e-mail to Mr. Syphax, dated January 10, 2006, citing inaccuracies in Mr. Syphax' account of the events that occurred during the December 27, 2005, meeting **(Exhibit 15)**. Mr. Ashdown provided documentation in the form of e-mails, dated December 27, 2005, and December 28, 2005, requesting to meet with Complainant and Mr. Mallard regarding the Lincoln Memorial incident **(Exhibit 9, pp. 249 - 250);** and an affidavit Mr. Ashdown provided in a discrimination complaint filed by Mr. Mackie Grant regarding the December 27, 2005, Lincoln Memorial incident and the December 28, 2005, meeting **(Exhibit 16).** Additional documentation provided by Mr. Ashdown relates to Claim 1f and 1h, which were recommended for dismissal.

## _Survey of the Environment_

There are sixteen (16) employees in the Grounds Branch, DRM **(Exhibit 17)**. Twelve (12) are identified by race as African American; three (3) are Caucasian; and one (1) is Asian Pacific Islander. There was no data identifying those employees by color. There have been six (6) EEO complaints filed by DRM employees during the period covering 2004 - present **(Exhibit 18)**. Three (3) of those complaints were filed by Complainant on January 5, 2004, January 27, 2005, and the instant complaint on March 31, 2006.

## VII.  **DESCRIPTION OF EXHIBITS**

| Exhibit 1 | Formal Complaint of Discrimination, dated March 31, 2006 |
|---|---|
| Exhibit 2 | Notice of Receipt of Complaint, dated April 11, 2006 |
| Exhibit 3 | EEO Counseling Report, dated April 12, 2006 |
| Exhibit 4 | Notice of Acceptance, dated November 28, 2006 |

| | |
|---|---|
| Exhibit 5 | Letter of Authorization to Investigate, dated January 19, 2007 |
| Exhibit 6A | Letter from Complainant, dated January 31, 2007 |
| Exhibit 6B | Letter from Complainant's Representative, dated January 30, 2007 |
| Exhibit 7 | Sworn Testimony of Responsible Management Official, Jesse Mallard Jr. |
| Exhibit 8 | Sworn Testimony of Responsible Management Official, Stephen Syphax |
| Exhibit 9 | Sworn Testimony of Responsible Management Official, Anthony Ashdown |
| Exhibit 10 | Sworn Testimony of Witness, Stephen Lorenzetti |
| Exhibit 11 | Sworn Testimony of Witness, Rose Capers-Webb |
| Exhibit 12 | Documentation Regarding Complainant's Work Assignment to Wash Walls at Lincoln Memorial |
| Exhibit 13 | E-mail from Anthony Ashdown, dated November 29, 2005, Subject: Texas Size - Ergonomic Solution |
| Exhibit 14 | Memo, from Steve Syphax, dated December 28, 2005, Subject: Yesterday's Lincoln Memorial Incident |
| Exhibit 15 | E-mail from Anthony Ashdown to Stephen Syxphax, dated January 10, 2006, Subject: Your Notes of 12/28 |
| Exhibit 16 | Copy of Affidavit of Anthony Ashdown, dated August 29, 2006 |
| Exhibit 17 | Employee Roster |
| Exhibit 18 | List of EEO Complaints, DRM, 2004 - present |

# <u>Raymond Gresham v. Dirk Kempthorne,</u>

# Civil Action No. 07-0752 (JR)

# Exhibit 2

Ray, on 8-21-05 you were told about the condition of Lincoln memorial and the need to clean it ASAP, interior walls, exterior walls, the steps, and MLK Plaque. The Equipment and Materials you need has been purchase. You need to get started ASAP

From Mallard
to Gresham

# Raymond Gresham v. Dirk Kempthorne,

## Civil Action No. 07-0752 (JR)

## Exhibit 3

From:       Jesse Mallard/NACC/UPS
To:         Raymond Gresham/NAC/UPS
Date:       Wednesday, November 02, 2005 08.50AM
Subject:    Completion of work assignment

Ray,

   I have been getting many complaints about the condition of the Lincoln Memorial. On Friday October 28, 2005 I went to Inspect the memorial and noticed that the work you were instructed to complete by October 6, 2005 was incomplete. I am now requesting that the job be complete by November 17, 2005. Please remember that the completion of the job consist of the wash of the exterior walls, the Interior walls on the south end of the memorial, Clean the room area in front of the elevator on the chamber level, and the steps (white and brown) must be cleaned also.

   Also, please be reminded that I need an update on Kareem Wilson's condition and a light duty schedule on Mackie Grant for our records by COB today. Should you have questions or concerns completing the requested job by November 17, 2005, please let me know in writing ASAP,

JESSE

000314

# Raymond Gresham v. Dirk Kempthorne,

## Civil Action No. 07-0752 (JR)

## Exhibit 4

```
1              IN THE UNITED STATES DEPARTMENT OF INTERIOR

2                        National Park Service

3

4      In re:                          )    ORIGINAL

5      RAYMOND GRESHAM, JR.,            )  Docket No.

6              Complainant.            )  FNP-2006-058

7              *         *         *         *         *

8

9

10

11

12

13

14

15              The deposition of JESSE MALLARD, JR., was

16     taken on Monday, February 5, 2007, commencing

17     at 1:31 p.m., at the offices of National Park

18     Service, 1100 Ohio Drive, S.W., Washington, D.C.,

19     before Wanda L. Granger, CVR, CCR and Notary

20     Public.

21

22              *         *         *         *         *
```

```
 1                    A P P E A R A N C E S

 2

 3    NATIONAL PARK SERVICE INVESTIGATOR:

 4              CARL BRADLEY, JR.,

 5              National Park Service

 6              1100 Ohio Drive, S.W.

 7              Suite 105

 8              Washington, D.C. 20242

 9              (292) 554-7414

10

11

12

13

14

15

16

17

18

19

20

21

22
```

```
1        Q.    And where is he employed?

2        A.    National Mall and Memorial Parks.

3        Q.    Does he work with a particular crew?

4        A.    Yes, he does.

5        Q.    And what is that?

6        A.    The memorial crew.

7        Q.    Does he supervise the memorial crew?

8        A.    Yes, he does.

9        Q.    Is Mr. Gresham under your immediate

10   supervision?

11       A.    Yes, he is.

12       Q.    Do you have any recollection or knowledge

13   of Mr. Gresham being compelled to work in an

14   unsafe manner on or about November 7, 2005?

15       A.    No, I don't.

16       Q.    Do you have any recollection of

17   Mr. Gresham receiving or being given an assignment

18   to wash the interior and exterior walls on the

19   sound end of the Lincoln Memorial?

20       A.    Yes.

21       Q.    Who gave him this assignment?

22       A.    I did.
```

1      Q.    Had you previously given the same

2    assignment to Mr. Gresham?

3      A.    Yes.

4      Q.    What, that same year or the year

5    previous?

6      A.    I would say the year previous prior to

7    that one because I don't think we washed them down

8    that year either.

9      Q.    Exactly what did this assignment entail;

10    what did he have to do, or him and his crew have

11    to do?

12      A.    Just wash down the spider webs off the

13    walls and the ceiling of the Lincoln Memorial,

14    interior and exterior.

15      Q.    Did Mr. Gresham express any concern about

16    this assignment being hazardous to him, his crew

17    and the public?

18      A.    Not to me.

19      Q.    Was this the first time you ever gave him

20    this assignment?

21      A.    No.

22      Q.    How often would you have given this

1    a meeting that we was in.

2        Q.    What did he say -- which meeting are you

3    referring to, a meeting at a later date?

4        A.    The meeting with Mr. Syphax, myself and

5    Mr. Gresham.  And Mr. Ashdown was there also.  He

6    stated that they wasn't doing anything, just

7    watching pornography on the computer, along with

8    other things.  But that's one that I checked into

9    and found out it wasn't true.

10        Q.    How did you check into it?

11        A.    Well, at the time, the IT person/computer

12    specialist, he has a way of knowing what sites you

13    go onto and, apparently, he came back with there

14    were none.  At least that's what he told me.

15        Q.    During the meeting on or about

16    November 21st, 2005, did Mr. Gresham express any

17    objection about Mr. Ashdown being in the meeting?

18    This is the meeting that you had that was had with

19    Mr. Syphax, Mr. Gresham, yourself and, I guess at

20    some later point, Mr. Ashdown.

21        A.    I don't remember him saying anything

22    about him being there, no.

1      Q.   Was Mr. Ashdown present at the meeting

2  when it started?

3      A.   Yes.  As far as I can remember, yes.

4      Q.   You say you had someone, an IT specialist

5  look and check the computers to see if any

6  employees had gone to an improper website or

7  pornography website?

8      A.   Yes.

9      Q.   Were you able to find anything?

10      A.   He said he didn't find anything.  There

11  were nothing there.

12      Q.   Was your crew aware that Mr. Gresham had

13  said or had alleged that they were using the

14  computer to look at pornography?

15      A.   Yes.

16      Q.   How did they react to that?

17      A.   Well, they didn't like it at first,

18  but -- because it was a false statement, and there

19  was nothing else said on it, because I had to ask

20  them.

21      Q.   How did they react to Mr. Gresham for

22  making this allegation?

M.A.R. REPORTING GROUP          PLATT & DAWSON
Professional Court Reporters
www.mar-reporting.com
(703) 534-1225

1     A.    I don't recall any incident happening in

2     reference to that.

3     Q.    Do you have any knowledge of Mr. Gresham

4     receiving an e-mail from Mr. Tony Ashdown that

5     Mr. Gresham felt threatened by?

6     A.    What was the e-mail?

7     Q.    In the e-mail, it contained a picture of

8     snake.

9     A.    Yes, Mr. Gresham, among 50 other people.

10    More than Mr. Gresham got the same e-mail.  I got

11    a copy, like all of the employees.

12    Q.    What was the point behind the e-mail?

13    A.    I have no idea, but he just sent it out.

14    And it was something that happened in Texas and he

15    sent it to all the employees.  Why he did it, I

16    have no idea.  But he didn't single out

17    Mr. Gresham on it, because I got a copy myself and

18    was not offended by it or threatened by it.

19    Q.    Was the e-mail message intended to

20    suggest that Mr. Gresham was a dead snake because

21    he complained about or made the accusation that

22    members of your crew were using the computer to

1  watch pornography?

2      A.   I don't have no knowledge that that was

3  the intent, no.

4      Q.   Well, how did you take the e-mail with

5  the picture of the dead snake?

6      A.   It didn't bother me one bit.

7      Q.   Do you know what Mr. Ashdown was trying

8  to suggest or what was the purpose of Mr. Ashdown

9  sending that e-mail out?

10      A.   I don't know that there was a purpose and

11  I don't know his reasons for sending it.  But like

12  I said, we all got a copy, so I don't know what

13  his reason was.

14      Q.   Do you believe that Mr. Gresham was

15  criticized for having complained about members of

16  your crew using the computer to watch pornography?

17      A.   No one ever criticized him as far as I'm

18  concerned -- I mean as far as I know.

19      Q.   Was he harassed or subjected to any type

20  of retaliation or reprisal --

21      A.   Not that I --

22      Q.   -- from you?

# <u>Raymond Gresham v. Dirk Kempthorne,</u>

# Civil Action No. 07-0752 (JR)

# Exhibit 5

**From:**    Jesse Mallard/NACC/NPS
**To:**       Tony Ashdown/NACC/NPS
**Date:**     Tuesday, January 10, 2006 07:52AM
**Subject:**  Texas Size - Ergonomic Solution

-----Forwarded by Jesse Mallard/NACC/NPS on 01/10/2006 07:51AM -----

To:
From: Tony Ashdown/NACC/NPS
Date: 11/29/2005 04:21PM
Subject: Texas Size - Ergonomic Solution

The below "Texas Style" Safety Alert was sent out and forward by a good friend.  The message's intent does not apply to NPS since we don't shoot snakes - so I've been told.... (LH)

But aside from the snake....look at the mechanical grabber he's using.....not one of those antiquated potential hazardous pointy picker sticks.....that we still seen around here occasionally.
(I wonder how many pair of boot they guy got out of the skin?)

**Subject:** Rattlesnake -- Texas Size

Texas Rattlesnake!!!!!!!!!  The joy of living in Texas.  The snake was recently found at the old Turkey Creek gas plant located just south of the Alibates Turnoff on Highway 136 south of Fritch, Texas  -- that's just North of Amarillo.. It's the safest way for you and the snake doesn't care anymore. A reminder that these creatures are actually out there and no matter what you believe, sometimes they should get not only prescriptive rights to be there but the full right of way!

**9 feet, 1 inch -- weighed 97 pounds**

~~No matter what anybody tells you, kill the snake before you try to do anything else to it!~~

1/31/2006



# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 6



# United States Department of the Interior

**NATIONAL PARK SERVICE**
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

P4217 (0008)
FNP-2006-058

**CONFIDENTIAL**
**TO BE OPENED BY ADDRESSEE ONLY**

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

E. Ned Sloan, Esquire
Attorney at Law
7600 Georgia Avenue N.W., #208
Washington, D.C. 20012

Dear Mr. Sloan:

This is in reference to the complaint of discrimination that your client, Raymond Gresham, filed with the National Park Service. Your client's complaint filed on March 31, 2006, was received in the NPS Equal Opportunity Office, in Washington, D.C., on March 31, 2006, and has been assigned Docket Number FNP-2006-058. Please refer to this Docket Number in all communications regarding this complaint.

We have reviewed your client's complaint and have identified the following claims for further processing.

1. Your client alleges that he was discriminated against based on race (African American), color (Black) and reprisal (previous EEO activity); your client was subjected to a hostile working environment and to harassment (non-sexual) when:

   a. On November 7, 2005, he was compelled to work in an unsafe manner;

   b. On November 7, 2005, management dismissed your client's assertions of unsafe working conditions;

   c. On November 21, 2005, management questioned your client's work assignments;

   d. On November 23, 2005, your client informed management of questionable computer use by other employees, and was criticized for the action;

e. On November 29, 2005, your client received an electronic mail message that he felt was threatening;

f. On December 27, 2005, a subordinate of your client was assaulted by another employee;

g. On December 28, 2005, your client was subjected to verbal abuse;

h. On December 28, 2005, your client contacted the Office of the Inspector General and has not received any response.

In accordance with Title 29 Code of Federal Regulations 1614.105(a) (1), an aggrieved person must initiate contact with a counselor within 45 days of the date of the matter alleged to be discriminatory. We are waiving the time limits with regard to claims "a" through "e", and "g," because these claims have been identified as a continuing violation. To state a continuing violation claim, a complainant must allege a series of related acts, one or more of which falls within the limitation period. The essential component of a continuing violation claim is a theme that unites the employer's acts into one continuous pattern of discrimination. This claim is thematically linked because it refers to a series of employment matters involving the same supervisor. Accordingly, we find that claims "a" through "e," and "g" should be accepted based on a continuing violation theory.

With regard to claims "f" and "h," we are recommending dismissal because your client has failed to state a claim under 29 Code of Federal Regulation (CFR), Section 1614.103. Claim "f" involves another employee and not your client, whereas claim "h" concerns the activities of the Office of the Inspector General, over which the National Park Service has no authority. Accordingly, the National Park Service has no jurisdiction to investigate any claims concerning the employment policies or practices of the Inspector General.

The final decision regarding the dismissal of claims "f" and "h" will be made by the Administrative Judge, EEOC, if you request a hearing from the EEOC. If you request a final agency decision, the decision will be made by Sharon D. Eller, Director, Office of Civil Rights (OCR). Therefore, claims "f" and "h" will not be investigated at this time.

By this letter, we are accepting your client's claims "a" through "e," and "g" for investigation and further processing. Please review the accepted claims carefully. If you are not satisfied with the claims as stated, you may, within **5 calendar days of receipt of this letter**, submit a statement to this Office concerning our articulation of your issues, which will become a part of the complaint file.

Your complaint shall be processed in accordance with Title 29 CFR 1614.106 through 1614.110. We have calculated that on September 27, 2006, 180 days **had** elapsed since the filing of your formal complaint. You will be notified of the assignment of an Equal Opportunity Investigator who will conduct the investigation of your complaint.

The investigation of your client's complaint should have been completed within **one hundred-eighty (180) calendar days** from the date that your client filed his complaint. Since the

investigation was not completed within that time frame, your client has the right to request a hearing before an Administrative Judge (AJ), from the Equal Employment Opportunity Commission (EEOC). To make such a request, please refer to the guidance described below regarding the right to request a hearing which is available to your client upon his receipt of the Report of Investigation.

Upon completion of the investigation, a copy of the Summary and ROI will be issued to you for your client's review and retention. You are required to safeguard witness statements, affidavits, responses to interrogatories, and other information which relates to your client's complaint, by not making public disclosure of such information, and by using such information only in connection with the processing of your client's EEO complaint. Upon issuance of the ROI, your client will have the right to request a hearing before an AJ or a final decision, without a hearing, from the Department of the Interior. Your client will have **thirty (30) calendar days** from the date you receive the ROI in which to make this request.

If your client elects to have a hearing, you are required to certify to the AJ that you sent a copy of the hearing request to the Department of the Interior. Your client's request for a hearing must be made directly to the EEOC and sent to the following address:

> Field Director
> Washington Field Office
> Equal Employment Opportunity Commission
> 1801 L Street, N.W., Suite 100
> Washington, D.C. 20005

A copy of your client's request for a hearing must also be provided to:

> Dianne A. Spriggs
> EEO Program Manager
> National Park Service
> Department of the Interior
> 1849 C Street, N.W.
> Washington, D.C. 20240-0001

If your client requests a final decision without a hearing, the Director, Office of Civil Rights (OCR), Department of the Interior will issue a final decision, within **sixty (60) calendar days** of the Agency's receipt of your client's request.

If your client is not satisfied with the final decision, your client may appeal to the EEOC, within **thirty (30) calendar days** of your client's receipt of the decision, **with a copy to the Director, OCR.** Your client's appeal must be made to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 19848
> Washington, D.C. 20036

You may also hand deliver your client's appeal to the following address:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> Appellate Review Programs
> 1801 L Street, N.W.
> Washington, D.C. 20507

You must submit a copy for the Director, OCR, as follows:

> Sharon D. Eller
> Director, Office of Civil Rights
> U.S. Department of the Interior
> 1849 C Street, N.W., Room 5214
> Washington, D.C. 20240

Your client has the right to file a civil action within **ninety (90) calendar days** of your receipt of the EEOC's decision, or after **one hundred and eighty (180) calendar days** of filing an appeal if EEOC has not made a final decision.

If you have any questions concerning the scheduling of the investigation of your client's complaint, you may contact Joy Harris, EEO Manager, National Capital Region at (202) 619-7020.

Sincerely,

*for Mary E. Beney*

Dianne A. Spriggs
EEO Program Manager


cc:    Joy Harris, EEO Manager, National Capital Region
       Raymond Gresham, complainant

# Raymond Gresham v. Dirk Kempthorne,

## Civil Action No. 07-0752 (JR)

## Exhibit 7

Supply List

8/20/

1) ~~Aluminum ~~ ~~Pipe~~ ~~Cleaning~~

2) Nozzels (yellow RED) - plastic toy 1½ ~~type~~
   (3) N573

3) RAIN SUITS / PVC          (12) 2 First Aid Kit
   1. ~~XL~~
   3 2X                       (13) Tool Box + Tools
   2. 3X        S1030
   1 4X                       (14) Mop Heads

4) RUBBER BOOTS / Slickers
   1 SIZE 11
   5 SIZE 12                  4811
   1 SIZE ~~13~~ 14

5) THICK Gloves

6) THIN Gloves

7) WATER type Gloves

8) Gum Scrapers -

9) BLADES

10) SAFETY GLASSES -

11) 2 Jumper Cable

000307

# Raymond Gresham v. Dirk Kempthorne,

## Civil Action No. 07-0752 (JR)

## Exhibit 8

Memo for Record

On 8-21-05, I talked to Mr. Ray Gresham about the condition of the Lincoln Memorial. I told him I would need for him and his crew to clean the steps, the interior and exterior walls, of the memorial, to correct the problem. I told him that I would also need him to clean the Martin Luther King (MLK) Plaque. Mr. Gresham replied he needed supplies for him and his crew to complete the job. I asked him to supply me with a list of everything he needs to get the job done. After this, I informed Mr. Lorenzetti that Mr. Gresham was in need of supplies to get the job done so he gave me the o.k. to purchase them.

On 8-25-05, Mr. Gresham gave me a list of supplies needed for him and his crew.

On 8-31-205, I purchased the supplies for Mr. Gresham.

On or around 9-2-05, I issued the supplies to Mr. Gresham. This was witnessed by Mr. Nugyen and Mr. Brookins. About one week later, I asked Mr. Gresham again to get started with the wash down of the Lincoln Memorial and MLK Plaque. Mr. Greshman said, "He didn't know where the equipment was because Tony Donald had it". I then instructed him to get with Tony to locate the equipment so that the job maybe completed.

On 9-29-05, I received a call from Jennifer Talken-Spaulding about the condition of the Lincoln Memorial. I then informed Mr. Gresham about the complaints. Mr. Gresham told me he didn't have anyone to do the job. He went on to say the reason Mr. Grant can't do the job is because he is on light duty. I asked Mr. Gresham if he had completed the paperwork required for Mr. Grant to be on light duty his response was, "No, you do it."

On 10-3-05, I meet with Mr. Lorenzetti in his office to let him know of the response I got from Mr. Gresham concerning his assigned duty. Mr. Lorenzetti instructed me to document everything and let Mr. Gresham know that the job must be completed by Thursday, October 6, 2005. After my meeting with Mr. Lorenzetti, I e-mailed Mr. Gresham of the expected completion date.

On 10-6-05, I received a phone call from Mr. Lorezetti asking why the wash down of the Lincoln Memorial wasn't complete. I told him I would get with Ray to find out what happened. When I confronted Ray about it, he said Mr. Lorenzetti told him not to do the wash down and that he would talk to Mr. Lorenzetti about it himself. After Mr. Gresham inquired about Mr. Lorenzetti's location and left, I called Mr. Lorenzetti by phone to inform him of what Mr. Gresham said, Mr. Lorenzetti replied, he did not instruct Mr. Gresham not to complete the Lincoln Memorial.

# <u>Raymond Gresham v. Dirk Kempthorne,</u>

# Civil Action No. 07-0752 (JR)

# Exhibit 9

# ATTACHMENT E

537
538
539

**Tony Ashdown**

11/23/2005 02:36 PM EST

To: Raymond Gresham/NACC/NPS@NPS
cc: Jesse Mallard/NACC/NPS@NPS, Stephen Syphax/NACE/NPS@NPS
Subject:     Nov. 21st meeting - issues

540
541
542 Ray:
543 I was looking over my notes of our discussion this past Monday and a couple of things
544 came to mind and I wanted to keep you up to date.
545

546 **GFIC**
547 I spoke with Keith McCray this morning and he indicated that you did not come to see
548 him about obtaining a GFIC pigtail as we discussed and you agreed to. He may not
549 provide you with one, but will provide you the ordering information. We are to
550 standardize on such equipment. I recommend you call him first, because he his out
551 and about. Please let us know when you have it because I want you and your folks to
552 fully understand it use, test procedures and limitations.
553

554 **Jefferson Statue**
555 Yesterday afternoon while I was at the Jefferson waiting for our electricians to help me
556 troubleshoot a circuit problem, I noted you were talking with one of the USPP security
557 officers. I didn't have time to interrupt your discussion, but I had a moment to wander
558 inside the Chamber and noted the mud dauber wasp nest was not completely removed
559 from the statue as you told us it was Monday during our walk around at Lincoln. Would
560 you mind getting with your folks and having it properly taken care of.
561

562 **Your Comments**
563 During our meeting Monday, you made mentioned of couple of things that not only
564 caused me concern personally, but I would think Steve and Jesse both also.
565

566 While I was making notes regarding the scaffolding, you were talking about some
567 matter requiring or being investigated. You turned to me and told me I was even being
568 investigated. I asked you for clarification and you simply repeated your statement and
569 went on about an earlier supervisor.
570

571 Your implication or statement about me, caused me a bit of concern so I asked my
572 supervisor and our AO who responded they new nothing about me being investigated.
573 I did not know if it was in relationship to the Confined Space Instrument repair costs,
574 but that was not it so they know nothing of what you stated.
575

576 Later, during the meeting when we were discussing manpower usage from Jesse's
577 other staff, you mentioned something about some of his staff viewing pornography
578 over the internet while at work. This is a serious, condemning remark or comment to
579 be made in front of folks.

March 7, 2007

## ATTACHMENT E (Cont'd)

I spoke with Jesse and encouraged him to investigate this matter. We all must comply with DOI/NPS computer security provisions. Our employees put their personal integrity and honor on the line and for the most part they know better, because "Big Brother is Always Watching" (i.e. Belarc software)

When someone in your supervisory position makes such statements or accusations in front of others about a person being investigated or a coworker viewing unauthorized web sites, you are damaging their reputation, casting dispersions on their character and integrity. If you vocalize such remarks, you in fact create a hostile work environment and slander a person's reputation. And, so you know, you verbalizations can result in legal action being taken against you because there were witnesses present at our meeting.

I caution you to carefully evaluate and consider what you say in the future. I do not mind much what you said to me in front of Jesse or Steve because it is not true but I do expect an apology from you. It did cause me to wonder and make a formal inquiry which took time away from my other duties, but it also took time for Ken and the Deputy Superintendent also. So it took 3 levels of management to stop what they were doing and dispel what you said to me. As you know time IS money and this park is like any other business. Time is a resource no business can afford to waste with unfounded comments or idle discussion.

But, your statement regarding your coworkers was really hard to take and let go of.

If you have evidence or witnesses to support your allegations you need to formerly address the matter with Jesse so it can be thoroughly investigated and action taken. If all you have is untruths or are attempting to divert attention from your work issues, I believe you also owe Stephen, Jesse, and perhaps your coworkers, a public apology and make amends somehow. And, unless you provide the documentation Jesse and Stephen need, I recommend you do this very soon.

Ray, I am willing to give you the support, encouragement and the technical information you need to help you with your work. For example, should your folks have another incident, I am requesting you contact me within 2-3 hours or so of the incident so I can sit down with you to do the SMIS report properly. The SMIS system has changed a bit and you may not be familiar with the changes. In any event, as a supervisor, you need to use SMIS as a tool properly and I insist that you call me. I have done this for a number of folks already.

Should you have any questions, please contact me.

Tony Ashdown, CSP
National Mall & Memorial Parks (NAMA)
Safety Manager
202.485.5820

March 7, 2007

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 10

1        IN THE UNITED STATES DEPARTMENT OF INTERIOR

2               National Park Service

3

4    In re:                    )

5    RAYMOND GRESHAM,           ) Docket No.

6         Complainant.          ) FNP-2006-058

7         *         *         *         *         *

8                    ORIGINAL

9

10

11

12

13

14

15

16

17      The telephone deposition of **ANTHONY K.**

18   **ASHDOWN** was taken on Tuesday, February 20, 2007,

19   commencing at 10:05 a.m., before Karlene Campbell,

20   Notary Public.

21

22         *         *         *         *         *

1    group.  I just wish they would talk to each other.

2        When I talked about recommending mediation

3    between the two, I didn't know that the core process

4    existed.  And that's a form of mediation between --

5    you know, to resolve internal conflicts.

6    Apparently, there is a history of issues within that

7    department about a number of things.

8        Q.    Okay.  Do you believe that -- do you have

9    any reason to believe that Mr. Gresham was subjected

10   to -- I'm sorry -- discriminated against based on

11   his race and/or color and being subjected to a

12   hostile work environment when he complained about --

13       A.    No.

14       Q.    -- safety hazard?

15       A.    No.  I mean, we listen to -- we listen to

16   every employee that has a valid concern.  I mean,

17   but sometimes -- well, sometimes folks use safety as

18   an issue or as an excuse not to get work done.  I

19   have seen this in 30-some years of working and

20   27 years working in the private sector.

21       Q.    He contends that he raised this safety

22   concern and there was no action taken by management

1  to address that.

2      A.    That's not true.  Because we had an

3  inspector come in.  And, you know, listening to all

4  the deficiencies, we couldn't even get parts for

5  that thing.  So I tagged it out of service, and

6  somebody tore the tag off.

7      Q.    Do you know if Mr. Gresham's crew

8  subsequently used the same lift?

9      A.    Oh, no, I hope not.  No.  I have no

10  knowledge of that.  And if they did use it, it was

11  against my knowledge -- without my knowledge.

12      Q.    How do you know that the tag was taken --

13  torn off?

14      A.    Because I inspected the area.  I took a

15  picture of the lift with the tag on it just so I

16  have photo-documented evidence.  And when I went

17  back, I guess, some months later, you know, the tag

18  was removed.  You have been in the Lincoln Memorial.

19  You know, it's a very public place.

20         And that lift is stuck off into the side in

21  a corner of the Lincoln.  And there is only just a

22  couple of barricades separating it from the public.

1    to supervisors.  I may make recommendations.  But I

2    also recommended that those two have counseling or

3    some type of mediation, if you recall.  I mean, it

4    was obvious there was a problem, a much larger

5    problem within that department.

6        Q.    Do you know if any action was taken to

7    investigate whether or not Mr. Mallard's crew was

8    viewing pornography --

9        A.    I have no idea.  I don't get into those

10   types of issues.

11       Q.    I would like to proceed to another

12   allegation raised by Mr. Gresham.

13       A.    Sure.

14       Q.    Do you have any -- I'm sorry.  It is the

15   contention of Mr. Gresham that on November 29, 2005,

16   he received an e-mail message that was -- and he was

17   cc'd from you which included a picture of a dead

18   snake.

19       A.    Oh, the rattlesnake, yes.

20       Q.    And he perceived that this was a death

21   threat to him.

22       A.    Oh, no, no.  That was an incorrect

1  perception.

2      Q.   Did you send --

3      A.   I sent it to many, many supervisors.   I

4  even sent it to folks who I attended fundamentals

5  class with.   In fact, someone sent it to me.

6      Q.   What was the e-mail about?

7      A.   It was -- I don't have a copy here in front

8  of me.   But as I recall, it was a photograph of a

9  guy holding out a rattlesnake, a dead one, using,

10  like, litter grabbers, these things that you use

11  without bending over, you know, to pick up trash.

12      Q.   Yes.

13      A.   At that time I was trying to send a loud

14  and clear message about the ergonomic advantages of

15  using those types of grabbers to pick up trash in

16  the park.   Because now they are using these picker

17  sticks with a nail on the end of it.

18          And I was trying to get -- I was using

19  every opportunity I could to push change over to use

20  of those types of litter grabbers.   Okay.   And there

21  may have been something in there about how heavy it

22  was.

1          And I think the guy -- I can't remember if

2   the guy was using one hand or both hands to hold the

3   snake up.  But it was -- I guess it was pretty

4   heavy.

5          So what I was trying to do is say, you

6   know, litter grabbers you can use, you know, to lift

7   really heavy objects with in order to throw it away.

8   But that e-mail went -- I mean, it went to

9   everybody, not just him.  I mean, it even went to

10  folks in the -- my counterparts in the other parks

11  in the region.

12      Q.    Did you have any discussions with

13  Mr. Gresham about this e-mail?

14      A.    Oh, not at all.  That's why I was surprised

15  when someone -- I think it was Jesse came to me and

16  he was complaining about -- that he wrote an e-mail

17  or did something.  He was complaining about the

18  snake.

19          And I said, What are you talking about?

20  And then I think Jesse made me a copy of it.  I

21  probably have it here somewhere.  It was sent bcc,

22  you know, blind copy.  And I don't have a copy of

 1    the distribution list.

 2          But my distribution list for sending -- you

 3    know, it's a shotgun approach.  I send it to

 4    everybody.  I mean, I get messages from other parks

 5    that I send out to other folks.  The reason why it

 6    was bcc'd is because I had all the fundamentals

 7    people on there.  And I even send it to people

 8    outside the National Park Service as an FYI.

 9          Q.   So this e-mail which contained a picture of

10    a dead snake -- of a man holding a dead snake, this

11    was not directed or intentionally sent to

12    Mr. Gresham as a threat?

13          A.   No, not at all.  You know, despite how he

14    feels about me personally or whatever, it was

15    never -- it was never intended.  And I think there

16    is -- just to back up a little bit.

17          Remember, I mentioned my earlier e-mails to

18    him and trying to explain what the status of

19    everything was.  I think at the time he never -- he

20    didn't have access to e-mail.  And it must have been

21    maybe about that time when he started getting access

22    to e-mail.

1      And coincidentally, that was one of the
2   first things that he probably pulled up.  But he
3   shouldn't -- I have been sending these things out
4   for -- ever since I have been here, and he's the
5   first one that has ever complained.
6      Q.   How do you think Mr. Gresham perceives you?
7      A.   Well, I think he sees me as a member of
8   management on the other side, you know, against him.
9   I mean, he is -- when he told me that I was being
10  investigated, I eventually contacted the inspector
11  general's office who he said was investigating me.
12      And they told me that, yeah, he calls all
13  the time and he is just -- you know, they mentioned
14  the snake e-mail.  And I asked, Well, am I being
15  investigated?
16      And he said, No, you're not being
17  investigated.  But the guy suggested that I be
18  careful about what I send out to people.  And I have
19  the guy's name and who I talked to.
20      And I think even before that time, I asked
21  for conflict resolution between Ray and myself to
22  get this matter settled because he made statements

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 11

877
878                        **ATTACHMENT  H**
879  *Note:  This is the normal distribution list I send out for safety & health related subject matter, our*
880  *Safety & Health Bulletins, etc.  Some of the folks have been added or detracted as they join the*
881  *park and deleted as they leave us.*
882
883  **DOMINO DIRECTORY  - Group (MAILING LIST) : NAMA All Mgmt**
884  **Basics:**
885  Group name:        NAMA All Mgmt
886  Group type:        Mail only
887  Category:
888  Description:       All Mgmt, Div. Chiefs, Foremen
889  **Members:**

| 890 Billy Gibson/NACC/NPS | 909 Johnny Baker/NACC/NPS | 928 Romell Robinson/NACC/NPS |
|---|---|---|
| 891 Bob Karotko/NACC/NPS | 910 Jorge Alvarez/NACC/NPS | 929 Rosanna Weltzin/NACC/NPS |
| 892 Butch Harley | 911 Joseph F Brown/NACC/NPS | 930 Rose Capers-Webb/NCR/NPS |
| 893 Claudia Anderson/NACC/NPS | 912 Karen Cucurullo/NACC/NPS | 931 Sandra Tennyson/NACC/NPS |
| 894 Darryl McLeod/NACC/NPS | 913 Ken Brodie/NCR/NPS | 932 Sean Kennealy/NACC/NPS |
| 895 David Harley/NACC/NPS | 914 Lance Hatten/NACC/NPS | 933 Sharon Wheat-Laster/NACC/NPS |
| 896 Dawn Daniels/NACC/NPS | 915 Mark While | 934 Stan Cofield |
| 897 Debbie Washington/NACC/NPS | 916 Martha Ellis | 935 Steve Lorenzetti/NACC/NPS |
| 898 Domonic Newman | 917 Mary Willeford Bair/SHEN/NPS | 936 Steven Sims/NACC/NPS |
| 899 Doug Demmon/NACC/NPS | 918 Melvin Hayden/NACC/NPS | 937 Susan Burke/CHOH/NPS |
| 900 Ed Petru/NACC/NPS | 919 Oliver Johnson/NACC/NPS | 938 Tamey Peyton/NACC/NPS |
| 901 Gilbert Shupe/NACC/NPS | 920 Oscar Seegers/NACC/NPS | 939 Theodore Yates/NACC/NPS |
| 902 Gordy Kito/NACC/NPS | 921 Perry Wheelock/ROCR/NPS\ | 940 Tonya Robinson/NACC/NPS |
| 903 Harry Hagen/NACC/NPS | 922 Pete Peterson/NACC/NPS | 941 Valentine Anan/NACC/NPS |
| 904 Harry Olinger/NACC/NPS | 923 Rae Emerson/NACC/NPS | 942 Wayne Braxton |
| 905 Jesse Mallard | 924 Raymond Gresham/NACC/NPS | 943 Dennis Briscoe/NACC/NPS |
| 906 Joan Pegram/NACC/NPS | 925 Reginald Barkley/NCR/NPS | 944 George M Smith/NACC/NPS |
| 907 Joan Proctor | 926 Rick Merryman/NCR/NPS | 945 Jordan G Whitaker/NACC/NPS |
| 908 Joe Gentile/NACC/NPS | 927 Robbin Stockton/NACC/NPS | 946 Gary Sturdivan/NACC/NPS |

947
948
949  *Note: This is the normal distribution list I send out for safety & health related subject matter, our*
950  *Safety & Health Bulletins, etc.  Some of the folks have been deleted as they leave us.  Note not all*
951  *are from my NPS Fundamentals 2 course at the Grand Canyon.*
952
953                              954
955  **DOMINO DIRECTORY  - Group (MULTI-PURPOSE) : Composite Fundamentals**
956  **Inst II [3279/3286] & V**
957  **Basics:**
958  Group name:        Composite Fundamentals Inst II [3279/3286] & V
959  Group type:        Multi-purpose
960  Category:
961  Description:
962
963  **Members:**

| 964 Alyssa Baltrus/JELA/NPS | 979 Eva Ferrell/LEWI/NPS | 994 Nathan Epling/Partner/NPS |
|---|---|---|
| 965 Baird Todd/FOLA/NPS | 980 Jason Teraoka/REDW/NPS | 995 Pat Jablonsky/DETO/NPS |
| 966 Barney Riley/SAGU/NPS | 981 Jessica Liptak/HFC/NPS | 996 Patricia Rafferty/FIIS/NPS |
| 967 Ben Bledsoe/CAVO/NPS | 982 Jessy Smith/JODA/NPS | 997 Paula Molloy/WASO/NPS |
| 968 Ben Ruston/AMIS/NPS | 983 Jim O'Connell/Boston/NPS | 998 Ralph Coury/STEA/NPS |
| 969 Betty Wilcox/GLBA/NPS | 984 Jimmy Lippard/NERI/NPS | 999 Ramona East/SITK/NPS |
| 970 Brad Free/GRSM/NPS | 985 Joan Howard/GETT/NPS | 1000 Sonny Perry/NERI/NPS |
| 971 Brian Goodspeed/MISS/NPS | 986 Joe Llewellyn/GOGA/NPS | 1001 Stephanie Purcell/INDU/NPS |
| 972 Carlos Mateo/BISC/NPS | 987 Kim Watson/Partner/NPS | 1002 Thomas McAvoy/INDE/NPS |
| 973 Charles Folk/KNRI/NPS | 988 Larry Carpenter/JOTR/NPS | 1003 Toni Dufficy/HFC/NPS |
| 974 Chris Moore/YELL/NPS | 989 Loren Thomas/PORE/NPS | 1004 Trudy Patton/YELL/NPS |
| 975 Christine Farrar/LAME/NPS | 990 Mary Kay Gordon/BIBE/NPS | 1005 Vincent Reed/NACE/NPS |
| 976 Cidney Webster/GOGA/NPS | 991 Melanie Weeks/YELL/NPS | 1006 Warren Suyderhoud/NACC/NPS |
| 977 Claudia Magnus/GOGA/NPS | 992 Michael Hartsog/NERI/NPS | 1007 Wayne Braxton/NACC/NPS |
| 978 David Reus/HFC/NPS | 993 Mike Meldrum/GRSM/NPS | |

1008

March 7, 2007

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 12

1      IN THE UNITED STATES DEPARTMENT OF INTERIOR

2           National Park Service

3

4    In re:                        ) ORIGINAL

5    RAYMOND GRESHAM, JR.           ) Docket No.

6           Complainant.            ) FNP-2006-058

7         *        *        *         *         *

8

9

10

11

12

13

14

15       The deposition of ROSE CAPERS-WEBB was

16    taken on Monday, February 5, 2007, commencing

17    at 11:40 a.m., at the offices of National Park

18    Service, 1100 Ohio Drive, S.W., Washington, D.C.,

19    before Wanda L. Granger, CVR, CCR and Notary

20    Public.

21

22         *        *        *         *         *

```
 1                    A P P E A R A N C E S

 2

 3     NATIONAL PARK SERVICE INVESTIGATOR:

 4              CARL BRADLEY, JR.,

 5              National Park Service

 6              1100 Ohio Drive, S.W.

 7              Suite 105

 8              Washington, D.C. 20242

 9              (292) 554-7414

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1    A.    No.

2    Q.    What are your primary job

3  responsibilities?

4    A.    Employee safety.

5    Q.    Do you know the complainant, Mr. Raymond

6  Gresham?

7    A.    We've met.

8    Q.    Where does he work?

9    A.    I think he works at the Lincoln Memorial,

10  yeah, National Capital Parks -- oh, National Mall

11  and Memorial Parks, Lincoln Memorial.

12    Q.    Do you have a recollection of having any

13  discussions on or about November 7, 2005, with

14  Mr. Gresham?

15    A.    Yes.

16    Q.    What is your recollection of the nature

17  of your discussion?

18    A.    Well, basically, he came to me to tell me

19  about an incident or some incidences, actually,

20  working at Lincoln Memorial.

21        I have some notes here.  He felt that he

22  was being made to perform some activities that he

1    felt was unsafe to both him, his employees and the
2    general public.

3         Q.   Could you elaborate on them?

4         A.   The activities?

5         Q.   Yes.

6         A.   Basically, washing down of the Lincoln
7    Memorial.  And the activities he thought that
8    would be unsafe to him and the general public was
9    the use of large amounts of water.

10        And I guess, basically, it's pretty cold
11   in November and he saw it as maybe an opportunity
12   for the water to freeze, and even if not freezing,
13   the excessive amounts of water on the Lincoln
14   Memorial and the sidewalks and the steps that
15   could be hazardous to employees and to visitors in
16   the park.

17        In addition to that, the use of a
18   forklift, I believe, that they were required to
19   use.  And according to him, he didn't have the
20   manpower necessary to do the work and/or to use
21   that forklift.

22        Q.   How did you become aware of these

1    concerns?

2        A.   How did I become aware?

3        Q.   Yes.

4        A.   He came to my office.

5        Q.   Do you recall when?

6        A.   I believe it was on -- (reviewing

7    document).   It was on November 7th.

8        Q.   What action did you take upon Mr. Gresham

9    expressing these alleged safety concerns?

10       A.   I told him that I would contact his

11   safety manager in his park.

12       Q.   And who is that?

13       A.   That's Tony Ashdown.

14       Q.   And did you talk with Mr. Ashdown?

15       A.   Yes, I did.

16       Q.   And what information did you share with

17   him?

18       A.   Well, I told Tony -- actually, I sent an

19   e-mail to Tony and I spoke to Tony on that date,

20   also, just informing him of what Mr. Gresham's

21   concerns were.   And both me and Tony went out to

22   the site on that day, also, just to take a look at

1    his concerns.

2       Q.   And after your visit to the site, did you

3    reach any conclusions or did you take any

4    subsequent actions?

5       A.   No, I didn't.  Because I had informed the

6    safety manager for that park, it was no longer in

7    my hands.

8       And I told Mr. Gresham that I would

9    contact Tony, who was the safety manager in that

10   park, because that's basically how it should work.

11   They should go to the safety manager in their park

12   first and, if they can't get any resolution, then

13   they come to me.

14      And so I contacted Tony and we went out

15   together to take a look at Mr. Gresham's concerns.

16      Q.   Did Mr. Ashdown provide you with a

17   written response to Mr. Gresham's complaints?

18      A.   As to what was done?

19      Q.   Yes.

20      A.   I'm not sure if he provided me with a

21   written response as to what was done, but he did

22   send me a response as to what they wanted to do.

1   Mr. Gresham, no.

2       Q.   Okay.  Could you provide me with copies

3   of any correspondence between you and Mr. Ashdown

4   that relates to the alleged safety hazard that was

5   expressed by Mr. Gresham?

6       A.   Yes.

7       Q.   Was there, in fact, any -- or did either

8   you or Mr. Ashdown reach any conclusion that there

9   was any safety concerns either from Mr. Gresham,

10  his crew and/or the visiting public in

11  relationship -- I'm sorry, in relationship with

12  his assignment to, I guess, wash the exterior and

13  interior walls of the south end of the Lincoln

14  Memorial?

15      A.   You know, I'm not really sure if there

16  was any conclusion or not.

17          I do believe, though, that the forklift

18  or the manlift was taken out of service and that

19  Tony had determined that those guys were not

20  qualified or certified to use the lift at the

21  time, so they would not be using it to perform the

22  job, anyway.

1    Q.   Are you aware of Mr. Gresham having any
2    prior involvement in any EEO activity?

3    A.   No, I'm not -- actually, I have to take
4    that back.  Sorry.

5        I was called, I guess, maybe -- I'm not
6    sure how long after this incident -- in reference
7    to an e-mail by someone from your office, I
8    believe, the Solicitor General's Office -- I
9    believe that's the term that you would use -- in
10   reference to an e-mail.

11       And I think the e-mail had something to
12   do with a snake and how to capture a snake, or
13   something like that, an e-mail that was sent from
14   Tony.  It was also sent to Mr. Gresham, and he
15   thought that it was a harassing e-mail.

16   Q.   Did you see this e-mail?

17   A.   Yes, I did.

18   Q.   Were you cc'd?

19   A.   Yes.

20   Q.   Was the e-mail sent to you?

21   A.   Yes.

22   Q.   Do you have reason to believe that that

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 13

1           IN THE UNITED STATES DEPARTMENT OF INTERIOR

2                     National Park Service

3

4     In re:                        )    ORIGINAL

5     RAYMOND GRESHAM, JR.,          )  Docket No.

6              Complainant.          )  FNP-2006-058

7          *         *         *          *          *

8

9

10

11

12

13

14

15          The deposition of STEPHEN SYPHAX was

16    taken on Monday, February 5, 2007, commencing

17    at 10:16 a.m., at the offices of National Park

18    Service, 1100 Ohio Drive, S.W., Washington, D.C.,

19    before Wanda L. Granger, CVR, CCR and Notary

20    Public.

21

22          *         *         *          *          *

```
1                    A P P E A R A N C E S

2

3      NATIONAL PARK SERVICE INVESTIGATOR:

4              CARL BRADLEY, JR.,

5              National Park Service

6              1100 Ohio Drive, S.W.

7              Suite 105

8              Washington, D.C. 20242

9              (292) 554-7414

10

11

12

13

14

15

16

17

18

19

20

21

22
```

1    me something, not like that, but it was more of --

2    was it an assignment?  Nothing like that.

3        It was more of something that I looked at

4    and I didn't think -- you know, it was an

5    assignment, or something, or -- and maybe I

6    shouldn't even speculate because it was some time

7    ago, but no attachments like with a snake, you

8    know, nothing that was, you know, out of bounds,

9    you know, like that.

10       Q.   This allegedly was an e-mail message that

11   was cc'd from Mr. Ashdown which included a picture

12   of a dead snake.  And it is Mr. Gresham's

13   contention that this constituted a death threat to

14   him because he spoke about Mr. Mallard's crew

15   members viewing pornography on computers.

16       A.   No.  I have -- you know, I have seen --

17   I've had e-mail exchanges with Tony Ashdown where

18   he would send attachments and pictures and things.

19   But it usually was safety-related, even though it

20   might be wild safety-related.

21       And I, too, have sent Ashdown things that

22   I learned about; for instance, one that comes to

1  my mind that I think I recall sending him -- and I

2  think this was after my detail was over, but

3  knowing how he's kind of interested in such

4  things, there was one of these You Tube film clips

5  of an individual getting thrown from a vehicle who

6  didn't have his seat belt on, you know, a

7  godawful; you know, image, real, and I sent it to

8  Tony.

9          And there were other -- it's things like

10  that.  A snake, I don't recall that.  But it's not

11  unusual to get attachments to e-mails because

12  Tony, he writes a lot, he has links with all these

13  other safety officers throughout the country and

14  he's always sending out things that might not be

15  specifically Central-related.

16          So if it was a snake and it was some

17  issue about poisonous snakes, or something like

18  that, I could see that happening.  But I don't

19  know of anything kind of just out of the blue, a

20  snake kind of as a warning.  I don't recall any

21  snake image.

22          But Tony is pretty into e-mail and

# <u>Raymond Gresham v. Dirk Kempthorne,</u>

# Civil Action No. 07-0752 (JR)

# Exhibit 14

# Documents Request Response

Investigation for Docket Number FNP-2006-058

Request # 2. List of Resource Management Division employees filing EEO complaints during the past two years (2003 – present), to include: name/docket number/date of complaint/bases/issues/disposition

| Name | Docket # | Date of Complaint | Bases | Issues | Disposition |
|------|----------|-------------------|-------|--------|-------------|
| Grant, Mackie | FNP-06-048 | 02/23/06 | Race, Color, Age, Handicap | Hostile work environment due to disability | EEOC Hearing |
| Grant, Mackie | FNP-06-108 | 09/19/06 | Race, Color, Age, Reprisal, Physical Handicap | Retaliation for previous complaint Hostile work environment | Being Investigated |

Request # 3. List of prior EEO complaints filed by Raymond Gresham to include: name/docket number/date of complaint/bases/issues/disposition

| Name | Docket # | Date of Complaint | Bases | Issues | Disposition |
|------|----------|-------------------|-------|--------|-------------|
| Gresham, Raymond | FNP-04-021 | 01/05/04 | Race, Color, Reprisal | Suspension, Harassment | FAD – No Finding |
| | FNP-05-029 | 01/27/05 | Race, Reprisal | Harassment | Dismissed |
| | FNP-06-058 | 03/31/06 | Race, Color, Reprisal | Harassment, Hostile Work Environment | Being Investigated |

000323

# Raymond Gresham v. Dirk Kempthorne,

# Civil Action No. 07-0752 (JR)

# Exhibit 15

TO:        EEO

FROM:      RAYMOND GRESHAM

SUBJECT:   REQUEST FOR DISMISSAL


RE: FNP-2006-058
    P4217 (0008)

Dear Sir/Madam:

Pursuant to 1614.108(e) C.F.R., the investigation of a complaint must be held within 180 days of the filing date.

Because you have failed to investigate FNP-2006-058 within the required 180 days, I request a dismissal so that I can pursue this matter in US DISTRICT COURT.


Respectfully Submitted,

Raymond Gresham
January 31, 2007



000059